DON TRIMBOLI

*v.*

BOARD OF EDUCATION OF THE COUNTY OF WAYNE, *etc., et al.*

(No. 14117)

Decided April 10, 1979.

*Fowler, Paterno & Lane, Charlotte R. Lane* for plaintiff in error.

*Greene, Ketchum & Mills, Menis E. Ketchum, Lawrence J. Tweel* for defentant in error.

HARSHBARGER, JUSTICE:

Don Trimboli appeals an order of the Circuit Court of Wayne County dismissing his petition for mandamus to compel the Wayne County Board of Education and Wayne County School Superintendent Mose Napier to restore him to his position as Director of Federal Programs for the county schools.

Trimboli became a Wayne County teacher in 1961, and on June 4, 1964 signed a "Teacher's Continuing Contract of Employment" whereby he was employed by the board commencing August 26, 1964, at $508.00 per month with provision that salaries for subsequent school terms would be fixed by the board to be paid in the manner and time prescribed by law "... for the length of the school term to be fixed by the Board pursuant to law."[1]

---

[1] *W. Va. Code,* 18-5-15 sets the basic school term for teacher employment at ten months.

Section (h) of Trimboli's contract, on a West Virginia Department of Education approved form, is:

In pursuance of Section 1, Article 7, Chapter 18 of the Code of West Virginia, as amended by Chapter 53, Acts of the Legislature 1939, this contract is a continuing contract of employment and shall remain in full force and effect, subject to all the provisions herein set forth, except as modified by mutual consent of the board and the Teacher, unless and until terminated with written notice, stating cause or causes, to the Teacher, by

We find no record of any other contract between Trimboli and the board. However, since 1967 he has been paid on a twelve month basis and in 1972 became Director of Federal Programs in the system's central office.

In April, 1977 he was notified by Superintendent Napier that he was to be transferred from central office to a teaching position. He received written notice a few days later.

Trimboli requested a board hearing, which was held June 13. After the hearing the board affirmed the transfer.

I

W. Va. Code provisions in effect in April, 1977, defining Mr. Trimboli's status are not easily interpreted. Chapter 18, *Education* and Chapter 18A, *School Personnel,* had sections that may apply to him.

*Code,* 18-1-1(g) states:

"Teacher" shall mean teacher, supervisor, principal, superintendent, public school librarian

---

a majority vote of the full membership of the Board before April first of the then current year, or by written·resignation of the Teacher before that date, and such termination shall take effect at the close of the school year in which this contract is so terminated.

The expression "cause or causes" as in this paragraph used shall mean failure on the part of the Teacher to fulfill this contract, or violation on the part of the Teacher of a lawful provision hereof. This contract may be terminated at any time by mutual consent of the Board and the Teacher.

Section (m) states:

In the construction and operation of the contract as a continuing contract of employment, the Teacher may, from year to year, or from time to time, be assigned to other and different positions in the same school, or to other and different positions in other and different schools and that, in any such event, the salary of the Teacher may be increased or decreased, in accordance with changes in the kind of position or changes in the kind of duties.

or any other person regularly employed for instructional purposes in a public school in this State;

And, *Code* 18-1-1(h):

"Serving personnel" shall mean all non-teaching school employees not included in the above definition of "teacher. ..."

*Code* 18A-1-1 has these further pertinent definitions:

The definitions contained in section one [§ 18-1-1], article one of chapter eighteen shall be applicable to this chapter. In addition, the following words used in this chapter and in any proceedings pursuant thereto shall, unless the context clearly indicates a different meaning, be construed as follows:

a. "School personnel" shall mean all personnel employed by a county board of education whether employed on a regular full-time basis, an hourly basis or otherwise. School personnel shall be comprised of three categories: Professional personnel, auxiliary personnel and service personnel.

b. "Professional personnel" shall mean persons who meet the certification and/or licensing requirements of the State, and shall include the professional educator and other professional employees.

c. "Professional educator" shall be synonymous with and shall have the same meaning as "teacher" as defined in section one [§ 18-1-1], article one, chapter eighteen of this Code. Professional educators shall be classified as:

(1) "Classroom teacher": The professional educator who has direct instructional or counseling relationship with pupils, spending the majority of his time in this capacity.

(2) "Principal": The professional educator who as agent of the board has responsibility for the supervision, management and control of a school

or schools within the guidelines established by said board. The major area of such responsibility shall be the general supervision of all the school and all school activities involving pupils, teachers and other school personnel.

(3) "Supervisor": The professional educator who, whether by this or other appropriate title, is responsible for working primarily in the field with professional and/or other personnel in instructional and other school improvement.

(4) "Central office administrator": The superintendent, associate superintendent, assistant superintendent, and other professional educators, whether by these or other appropriate titles, who are charged with the administering and supervising of the whole or some assigned part of the total program of the county-wide school system.

d. "Other professional employee" shall mean that person from another profession who is properly licensed and is employed to serve the public schools.

e. "Auxiliary personnel" shall mean those persons selected and trained for teacher-aide classifications such as monitor aide, clerical aide, classroom aide, general aide.

f. "Service personnel" shall mean those who serve the school or schools as a whole, in a nonprofessional capacity, including such areas as secretarial, custodial, maintenance, transportation, school lunch.

Chapter 18A which must be read *in pari materia* with Chapter 18, *Smith v. Siders*, 155 W. Va. 193, 183 S.E.2d 433 (1971), has in its Article 4, Section 8, as it was in effect in 1977, pay scales for service and auxiliary personnel and lists and defines duties of both service and auxiliary employees. The enumeration commences with "Aide I," defined by reference to 18A-1-1 to be "those persons selected and trained for teacher-aide classifications such as monitor aide, a clerical aide, classroom aide, general aide"; and concluding with "School bus

supervisor." In between are listed custodian, carpenter, electrician, foreman, general maintenance, groundsman, handyman, lubrication man, machinist, mechanic, mechanic assistant, office equipment repairman, painter, plumber, maintenance supervisor, truck driver, and so forth.[2]

18A-4-8 [1976] also authorized the state board of education to establish other class titles of service personnel positions and pay scales for them. No regulation was in effect in 1977 placing professional educators, professional personnel, or "directors" of any sort in the service personnel class, to our knowledge.

We find that Chapter 18A's list of service personnel limits Chapter 18-1-1(h) which defines service personnel to be all non-teaching school employees not defined as teachers. Thus, tenure provisions for service personnel in 18A-2-6 and 18A-2-7, whereby after three years' satisfactory service they are entitled to continuing contracts, are not available to Mr. Trimboli.[3]

---

[2]18A-4-8 was amended in 1977 and 1978. The listing of service personnel was expanded. One of the classifications added was " 'Director or coordinator of services' [which] means personnel not defined as *professional personnel* or *professional educators* in ... [18A-1-1] ... who are assigned to direct a department or division." [our italics] ... "Professional personnel" in 18A-1-1 are certified or licensed persons, including professional educators and other professional employees. "Professional educators" are teachers per 18-1-1; principals; supervisors; and " 'Central office administrator': the superintendent, associate superintendent, ... whether by these or other appropriate titles, who are charged with the administering and supervising of the whole or some assigned part of the total program of the county-wide school system." It would seem that a director of federal programs must be within the professional personnel or professional educator class, and excluded from even the recently amended list of service personnel.

[3]*Code*, 18A-2-5 provides for board employment of service personnel by written contract which may be in letter form, accepted by signature by the employee. There is no evidence of such contract in this record.

On the record before us, Mr. Trimboli was not employed in any tenured classification except as a teacher, covered by his teacher's contract.

## II

Appellant claims that when he became Director of Federal Programs his teacher contract was modified to provide for twelve months employment as the Director of Federal Programs and that he thereby became entitled to continuing twelve month employment. But he introduced no contract to buttress his testimony, to show any status other than his basic teacher status.

No allegation was made, nor could have been made, that his teacher's contract was terminated. It was never an issue in any of the proceedings, and remains unsullied and in full effect.

If he was extended from ten to twelve month employment as a teacher, his claim to a vested right to twelve month employment as a teacher, is controlled by section (m) of the teacher contract: "The Teacher may, from year to year, or from time to time, be assigned ... to other and different positions ... [and] salary of the teacher may be increased or decreased, in accordance with changes in the kind of position or changes in the kind of duties."

## III

Trimboli alleges that the board acted arbitrarily and capriciously, and violated his First Amendment rights when it approved his return to teaching: that it acted as it did because he was opposed to, and vocal about, a bond issue election sponsored by the board. We agree that the reasons given by Superintendent Napier for his transfer were flaccid: that the superintendent wanted "... to see some new faces ... [and have] new ideas at the central office." However, we agree with the trial court that there was little, if any, proof that the reason for Trimboli's transfer was his opposition to the bond issue. The facts that he opposed it and thereafter was

transferred do not in themselves prove that one caused the other.

## IV

*W. Va. Code,* 18-5-32 provides in pertinent parts:

> The board, [of education] upon the recommendation of the county superintendent, shall have authority to employ such general and special supervisors or directors of instruction and of such other educational activities as may be deemed necessary. ... The period of employment for ... [such general and special supervisors or directors] ... shall be at the discretion of the board.[4]

This section appears to justify and prescribe Trimboli's employment for a term discretionary with the board, and one would conclude from it that he served at the board's pleasure. Hence, directors, supervisors, or other administrators, employed per *Code,* 18-5-32, who may also be *Code,* 18A-1-1 professional personnel or 18-1-1 people who administer or supervise some part of the county school program, could be demoted, promoted, or transferred at the whim of the board upon recommendation of the superintendent, or for such reasons as were assigned by Superintendent Napier for Director Trimboli's transfer and apparent demotion.[5]

However, *Powell v. Brown,* W. Va., 238 S.E.2d 220 (1977), admonishes that an administrative board must abide by its rules, which in that case and this are in

---

[4]The code section continues:

Any person employed under the foregoing provision of this section, provided he holds a valid teacher's certificate, shall be given continuing contract status *as a teacher* and shall hold such status unless dismissed for statutory reasons. [Emphasis added]

[5]Any school employee may be suspended or dismissed for immorality, incompetency, cruelty, insubordination, intemperance or wilful neglect of duty, after being charged in writing, and given a hearing. *Code,* 18A-2-8. There were no such charges against Mr. Trimboli.

Policy No. 5300, (6)(a) and (6)(b) of the West Virginia Board of Education.

Policy No. 5300, (6)(a) and (b) is:

> (a) Every employee is entitled to know how well he is performing his job, and should be offered the opportunity of open and honest evaluation of his performance on a regular basis. Any decision concerning promotion, demotion, transfer or termination of employment should be based upon such evaluation, and not upon factors extraneous thereto. Every employee is entitled to the opportunity of improving his job performance prior to the terminating or transferring of his services, and can only do so with assistance of regular evaluation.

> (b) Every employee is entitled to "due process" in matters affecting his employment, transfer, demotion or promotion.

In *Powell* we dealt with a probationary teacher's employment contract and we held that failure to renew it entitled the teacher to a grievance procedure hearing required by Regulation 5300(6)(b). We further found that the fact that the procedure was generous beyond statutory or constitutional requirements did not excuse a board of education from following it.

Here, grievance procedure is not questioned. The record reflects Trimboli's hearing, and it complies with our *North v. West Virginia Board of Regents*, W. Va., 233 S.E.2d 411 (1977) due process requirements, and thus with 5300(6)(b).[6]

## V

5300(6)(a) has never been applied or interpreted by this Court. Its implementation has not been mandated

---

[6] *See, State ex rel. Linger v. Board of Education of Putnam County*, 152 W. Va. 379, 163 S.E.2d 790 (1968) wherein this Court found the provisions of *Code* 18-5-4 prescribing procedure to be followed by school board precedent to teacher transfers, mandatory, and violation to be correctable in prescribing mandamas.

as a prerequisite to promotion, demotion or transfer of school employees.

There is no evidence about any evaluation by the Superintendent or anyone else of Trimboli's job performance, or improvement opportunity given to him. And we therefore must decide whether this policy affects the discretion of the board to terminate or transfer people who are 18-5-32 employees, and its effect upon employee Trimboli.

The rule unequivocally makes evaluation and opportunity to improve an *entitlement* of every board of education employee; and it makes no distinction between employees classified by statute as supervisory or whatever.

The employee right to evaluation and opportunity to improve is not however, buttressed by imposition of a supporting duty upon the board to *provide* evaluations. The rule simply says the employee "*should* be offered the opportunity of open and honest evaluation ... and that decisions about employees' change in status ... *should* be based upon such evaluation. ...." [Our emphasis]

We must resolve this difference liberally in fabor of the employee, *Lewing v. DeSoto Parish School Board,* 238 La. 43, 113 So.2d 462 (1959), and hold evaluation and opportunity to improve a mandatory function of every board of education, and right of every board employee. We do this, realizing that the result of Rule 5300(6)(a) is to give job protection to all school employees who are performing competently, against demotion, transfer or discharge without cause. Rule 5300(6)(a) has, in our view, fixed competent performance as the key to continued employment, just as effectively as would a statute to like effect [*see, Brown v. Powell, supra* and *United States v. Johnston,* 34 F. Supp. 4 (S.D. W. Va. 1941)], and has fixed evaluations and opportunity to improve to be prerequisites to transfers, demotions or terminations for incompetent performance *of all school board employees.*

The next question is whether a board's failure to provide these benefits affects its statutory authority to hire certain people to serve at the board's discretion.

Several state *statutes* require evaluation and opportunity to improve precedent to *discharge* of tenured school employees for incompetency. California's Stull Act, (formerly, Cal. Educ. Code, section 13407, now section 44938 of the Reorganized Educ. Code) is one, and it has been applied to require improvement opportunity be given before an employee can be discharged for defective performance. *Tarquin v. Commission on Professional Competence,* 84 Cal. App.3d 251, 148 Cal. Rptr. 522 (1978).

However, the California court has refused to make evaluation protection applicable to school administrators. In *Grant v. Adams,* 69 Cal. App.3d 127, 137 Cal. Rptr. 834 (1977), a school principal was reassigned to a teaching position. Principals are classified as administrators, and at the end of a probation period become permanent employees, but as classroom teachers.[7] Administrators have no tenure, serving at the pleasure of the appointing authority. Plaintiff relied on the evaluation requirements of the Stull Act to invalidate his transfer, but it was held to be inapplicable to purely administrative positions. California had no Rule 5300(6)(a) that applied to all school board employees.

An earlier California case involved a teacher who was dismissed from his permanent position because he violated two school board regulations, *viz.*, having outside employment and not being familiar with rules and regulations of the board. The court found these to be correctable faults, and because the teacher was not given 90 days notice to correct them, as required by statute, held the dismissal action premature. *Fresno City High School Dist. v. Dillon,* 94 P.2d 86 (1939).

The Illinois school code requiring 60 days notice to extend a teacher's probationary period was interpreted in *Glover v. Bd. of Educ. of Macon Comm. Dist. No. 5,* 21

---

[7]*See* n. 4, *supra*, for a similar provision in our Code.

Ill. App.3d 1053, 316 N.E.2d 534 (1974). The notice was required to state the reasons for the extension and outline corrective actions the teacher should take to complete probation, if the misconduct was correctable. The school board decided that the teacher's discipline problems and lack of rapport with students was irremediable, and the court agreed. In addition, the teacher had been warned by the superintendent and principal, and told to improve. His dismissal was upheld, even though no 60 day notice was given.

Missouri also has a Teachers Tenure Act that requires notice and warning 30 days before service of charges of incompetency, inefficiency, or insubordination. The purpose of the statute is to give the teacher an opportunity to know the exact complaints against him or her and to have a reasonable period of time to cure them. A teacher, charged with being late to her classroom in the mornings and not keeping children in straight lines on their way to the cafeteria, was given a warning notice but for different charges. The court found the discharge to be improper because the school board failed to comply with the statutory requirement that tenured teachers be given 30 days notice of alleged deficiencies to have opportunity to correct them. *Blue Springs Reorganized School District IV v. Landuyt*, Mo. App., 499 S.W.2d 33 (1973).

The Louisiana court in *Lewing v. DeSoto Parish School Board, supra,* held that a teacher should be reinstated even though there was no express statutory requirement of warning of poor performance, when her continued tardiness resulted in her dismissal.

However, in *Verret v. Calcasieu Parish School Board,* La. App., 201 So.2d 385 (1967) when a principal, reduced to teacher status, argued that as a matter of law he was entitled to warning notice in order that he could improve his work, the court decided that because of the nature of his misdeeds—incompetence and failure to provide his faculty ith adequate guidance, resulting in a strained principal-faculty relationship—warning would

not have helped. There was no regulation such as Policy 5300(6)(a).

In *Morgan v. New Mexico State Board of Education*, 83 N.M. 106, 488 P.2d 1210 (1971), a teacher was discharged, but not in compliance with a state school board regulation prescribing procedures to be followed by the board to allow correction of unsatisfactory work of personnel before notice of discharge is served upon them. The procedure adopted in the regulation, but not followed, required three conferences and a written record of the conferences, specifying: (1) the areas of unsatisfactory work performance, (2) action taken to improve the performance, and (3) improvements made.

Although the teacher was discharged for breach of contract for inflicting punishment in violation of school policy, and not for "unsatisfactory work performance," the court found the regulation to be applicable. And because the prescribed procedure was not followed, it reversed the board's decision to discharge the teacher. The court did say that it assumed that if the work performance was not correctable, the statute and regulation issued under its authority, would not be applicable.

These cases lead us to a very basic conclusion: Rule 5300(6)(a), like statutes and rules elsewhere to the same effect, is not a piece of fluff. Failure by any board of education to follow it, for all employees because it applies by its very terms to all employees, prohibits such board from discharging, demoting or transferring an employee for reasons having to do with prior misconduct or incompetency that has not been called to the attention of the employee through evaluation, and which is correctable.

We are aware of the *Grant v. Adams, supra*, language, quoted from *Hentschke v. Sink*, 34 Cal. App. 3d 19, 109 Cal. Rptr. 549 (1973): "... [A] second or third level administrator bears to his superiors a relationship of the most intimate nature, requiring complete trust by the top administrators in the judgment and cooperative

nature of the subordinate. The loss of that trust is not a matter susceptible of proof such as is involved in the cases where a classroom teacher is dismissed or demoted for objective acts of misconduct." 69 Cal. App.3d at 132, 137 Cal. Rptr. at 837.

But we are likewise aware that our Rule 5300(6)(a), makes no distinctions as to administrative, supervisory or other employees. It protects administrators and other board employees against demotion or transfer or discharge unless their work is openly and honestly evaluated and they have opportunity to improve. We mean no imputation of bad motives to the Wayne County Board of Education or its Superintendent when we recognize that in some West Virginia counties the "loss of trust" about which the California court wrote, has been failure by the "second or third level administrator" and his family to "vote right"; or his or her failure to be content with maladministration. We must, perhaps, sacrifice sweetness and harmony in school administration, to encourage competency and professionalism.

We remand the cause to the Circuit Court of Wayne County, to determine whether the Board of Education had complied with Rule 5300(6)(a). If it did not, the trial court will order Trimboli's reinstatement, with restoration of the pay loss he suffered by reason of his transfer from Director of Programs to the teaching position.

*Reversed and remanded.*

NEELY, JUSTICE, *Dissenting:*

I respectfully dissent from the Court's opinion upon the ground that it creates not only an unnecessary but a fundamentally unsound burden on public school administration in West Virginia. While the majority concludes correctly that Mr. Trimboli was an untenured administrator, they err in holding that West Virginia Board of Education Policy No. 5300(6)(a) requires formal evaluation and improvement periods before a *policy making* employee may be terminated or transferred. Even if Pol-

icy No. 5300(6)(a) imposes a condition precedent to the discharge or transfer of employees who do not make policy, it clearly cannot do so with regard to board of education administrative personnel.[1] Mr. Trimboli's employment as Director of Federal Programs for the Wayne County Board of Education was clearly pursuant to *W. Va. Code*, 18-5-32 [1949] which provides in pertinent part:

> The [county] board [of education], ... shall have authority to employ such general and special supervisors or directors of instruction and of such other educational activities as may be deemed necessary. ... [Their] period of employment ... shall be at the discretion of the board. [Emphasis supplied]

This provision alone precludes the majority's interpretation of Policy No. 5300(6)(a). While an administrative agency must be held to the standards which it establish-

---

[1] In my estimation, Policy No. 5300(6)(a) does not create a duty to provide *any* employee an evaluation and opportunity to improve work performance but is rather a policy statement by the West Virginia Board of Education that employees *"should* be offered ... [an] evaluation" and *"[are] entitled to* the opportunity of improving job performance." Noting the lack of any mandatory language might seem an exercise in result-oriented schematics; however, such is not the case when Policy No. 5300 is considered in its entirety. Its only mandatory language is found in sections seven and eight which provide respectively that "[a]ll official and enforceable personnel policies *must* be written and made available" and "[e]ach board of education *must* adopt a written grievance procedure" to resolve employer/employee differences." There is absolutely no provision mandating adoption of an evaluation procedure. Apart from sections seven and eight, Policy No. 5300 does not create substantive rights in an employee the deprivation of which can bar the employee's discharge or transfer. For example, Policy No. 5300(4) provides that employees *"should* be encouraged to make suggestions." It would be ridiculous to infer that a local board has a duty to solicit suggestions before it can discharge or transfer an employee. I reassert my dissent in *Powell v. Brown*, ____ W. Va., ____ 238 S.E.2d 220 (1977) where this court held that a nontenured probationary employee was entitled to "due process" by virtue of Policy No. 5300(6)(b).

es for itself, *Vitarelli v. Seaton,* 359 U.S. 535 (1959); *Powell v. Brown,* ___ W. Va. ___, 238 S.E.2d 220 (1977), it can legally adopt only those rules and regulations which are not in conflict with the laws enacted by the Legislature. *Anderson & Anderson Contractors, Inc. v. Latimer,* ___ W. Va. ___, ___ S.E.2d ___ (1979); *Walls v. Miller,* ___ W. Va. ___, 251 S.E.2d 491 (1978). In both *Anderson* and *Walls,* this Court, after examining the governing statutes and the underlying legislative policy, found certain regulations promulgated by the West Virginia Department of Natural Resources and the West Virginia Department of Mines respectively to be void because they conflicted with statutory law. While a uniform set of rules does not apply both to the mining of coal and the running of schools the principle that rules and regulations cannot contravene statutes applies to both. Policy No. 5300(6)(a) as interpreted by the majority is in direct conflict with *W. Va. Code,* 18-5-32 [1949]. The Legislature, in the proper exercise of its lawful powers, provided that policy making, administrative personnel would serve at the discretion of the local board. The Legislature recognized that superintendents must have loyal, enthusiastic officers to carry out their policy by making these officers serve at the will and pleasure of the board in *W. Va. Code,* 18-5-32 [1949]; the majority ignores the clear statute in reaching their decision. Administrators have a clear legal right to enthusiastic as well as competent personnel.

The stated purpose of a Policy No. 5300(6)(a) performance evaluation is to allow "[e]very employee ... the opportunity of improving his job performance, ...."; however, in the vast majority of cases, the differences which lead to transfer or termination of administrative personnel, *i.e.* lack of trust, ideological variances, or personality conflicts, are not susceptible to improvement through evaluation.[2] As is often the case with this Court as cur-

---

[2]The majority cites numerous cases from sister jurisdictions, but an examination of those cases reveal that they do not support an

rently constituted, I detect an attempt to temper the wind for the shorn lamb—under proper circumstances a laudable and legitimate judicial function. The facts here, however, do not justify creative expansion of Policy No. 5300 in the face of *W. Va. Code*, 18-5-32 [1949] because the petitioner behaved in such a way as to make his demotion a reasonable and foreseeable consequence of his own actions. Mr. Trimboli, in active opposition to a board sponsored bond issue, vocally denounced the bond issue at two public meetings after his fellow administrators specifically requested his cooperation. Boards of education are legitimately constituted, institutional lobbyists for better schools; better schools inevitably require money. It is obvious that *W. Va. Code*, 18-5-32 [1949] does not countenance a board of education's being required to feed, clothe, and comfort a fifth columnist in

---

evaluation/opportunity to improve procedure as a condition precedent to the discharge or transfer of administrative personnel. In *Miller v. Chico Unified School District*, ____ Cal. App. 3d ____, 148 Cal. Rptr. 270 (1978), the court specifically held that the statutorily mandated evaluation procedure applicable to all certified personnel, *Cal. Educ. Code*, § 44660 [1977], did not act as a condition precedent to the reassignment of an administrator. *See also Grant v. Adams*, 69 Cal. App. 3d 127, 137 Cal. Rptr. 834 (1977). The case of *Tarquin v. Commission on Professional Competence*, 84 Cal. App. 3d 251, 148 Cal. Rptr. 522 (1978) so highly touted by the majority merely held that an evaluation and opportunity to improve had to be afforded a teacher being dismissed for poor performance. A holding similar to that of *Miller, supra*, can be found in *Verret v. Calcasieu Parish School Board*, 201 So.2d 385 (La. App. 1967) where that court said:

> We cannot agree with [the] contention that before the School Board could lawfully remove him … as principal they must afford him an opportunity to rectify the conditions on which removal was founded. 201 So.2d at 387.

The other cited cases do not directly involve discharge or transfer of administrative personnel; however, they do make a distinction even on the classroom teacher level between correctable and uncorrectable situations. *See Glover v. Board of Education of Macon Community*, 21 Ill. App. 3d 1053, 316 N.E.2d 534 (1974); *Morgan v. New Mexico State Board of Education*, 83 N.M. 106, 488 P.2d 1210 (1971); *Blue Springs Reorganized School District IV v. Landuyt*, 499 S.W.2d 33 (Mo. App. 1933).

its own ranks. If a superintendent cannot be assured that his closest deputies will help him carry out the policy as made by the board, a legitimately constituted political body charged with making such policy, then how is there ever to be a concerted effort to improve the schools in West Virginia?

Not all politics is dirty, filthy, and utterly meretricious; politics *is* government and there are duly constituted political authorities elected to carry out certain policies dictated by voters. Does it not seem ludicrous that the voters should be able to elect a board of education to carry out a program, such as improvement of the school system, have the power to deny that board reëlection for failure to accomplish what the voters wish, and yet, at the same time provide a scheme where the very instruments which the board has been given to carry out voter initiated programs be permitted to oppose those programs at every turn with no fear of retribution? Unreasonable job tenure among the highest bureaucracy makes a farce of the democratic process. Had the petitioner been fired or demoted for failure to make a campaign contribution, for failure to hire someone's niece, for failure to work the polls for a particular board candidate, or for belonging to the wrong political "faction," my sympathies might be with the majority's result, although on the face of *W. Va. Code,* 18-5-32 [1949] I would be put to the task of constructing a more rational theory than the one based on Policy No. 5300. Perhaps, in the above hypothetical examples, the case would be within the penumbra of *Elrod v. Burns,* 427 U.S. 347 (1976), where the United States Supreme Court held that the patronage practice by which the Sheriff of Cook County, Illinois, on assuming office from a Sheriff of a different political party, would automatically replace non-civil service employees with members of his own party was violative of the first amendment. Even that holding, however, was limited to non-policy making and non-confidential employees. *See also Harless v. First National Bank in Fairmont,* ____ W. Va. ____, 246 S.E.2d 270 (1978). Slowly the good government lobby, the newspa-

pers, the bureaucracy, and the courts are convincing us that because of *some* abuse in the political process, *all* political decision making is evil. Consequently the modern trend is to have all elected officials and all will and pleasure appointees replaced by life tenured, colorless, odorless, tasteless bureaucrats who in their "professional judgment" know (by drawing upon the vast resources of their extensive educations) what is best for us. I am not ready to sell my birthright in return for arguable expertise; I want my elected officials to have the power to implement *my* policy as a voter because I still believe that the vote means something.