575 S.E.2d 278

Marjorie J. MAXEY, Petitioner
Below, Appellant,

v.

McDOWELL COUNTY BOARD OF
EDUCATION, Respondent
Below, Appellee.

No. 30440.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 17, 2002.

Decided Dec. 3, 2002.

Dissenting Opinion of Justice
Maynard Dec. 6, 2002.

Concurring Opinion of Justice
Starcher Dec. 12, 2002.

John W. Feuchtenberger, Feuchtenberger & Barringer Legal Co., Princeton, for the Appellant.

Kathryn Reed Bayless, Bayless and McFadden, LLP, Princeton, for the Appellee.

ALBRIGHT, Justice.

This is an appeal by Marjorie Maxey (hereinafter "Appellant") from a March 30, 2001, order of the Circuit Court of McDowell County affirming the West Virginia Education and State Employee's Grievance Board's (hereinafter "Grievance Board") decision to uphold the termination of the Appellant's employment by the McDowell County Board of Education (hereinafter "County Board") for insubordination. The Appellant appeals that determination, contending that the County Board failed to show good cause for her termination and that the Grievance Board erroneously failed to consider appropriate mitigation of the penalty of termination. Upon thorough review of the record and arguments of counsel, this Court reverses the lower court's decision and remands this matter for further proceedings consistent with this opinion.

## I. Facts

The Appellant was employed as a teacher for approximately sixteen years, three years in Wyoming County, West Virginia, and thirteen years in McDowell County, West Virginia. During her tenure in the McDowell County school system, she maintained an exemplary record of classroom performance evaluations until the events which form the basis of this appeal.[1] In the fall of 1996, Mr. James Spencer was a newly appointed principal at Bartley Elementary School, having

---

1. The Appellant taught a split seventh/eighth grade class at Bartley Elementary prior to the 1996–97 school year. She successfully bid into a new teaching position for a split fourth/fifth grade class at Bartley Elementary for the 1996–97 school year.

served only as an acting principal and assistant principal prior to accepting this position. The Appellant was, and had been for several years, a teacher at Bartley Elementary. While the record does not reflect precisely how the relations between Mr. Spencer and the Appellant initially became strained, the record reflects that Mr. Spencer began keeping a record of what he considered disagreeable incidents involving Mrs. Maxey at the school as early as September 1996. The record also reflects that Mr. Spencer placed telephone calls to Mr. Larry Lane, the Assistant Superintendent of Schools, reporting various instances of Mrs. Maxey's alleged intransigence and a comment that she could jump out a window. Mr. Lane advised Mr. Spencer to follow proper evaluation procedures. By the time the termination hearing was held before the County Board, Mr. Spencer had prepared as list of ten such "documented" instances to buttress his testimony against Mrs. Maxey.[2] However, the record further discloses that Mr. Spencer held no meetings with Mrs. Maxey regarding performance issues, other than those related following the November 1996 and March 1997 observations, next discussed.

**2.** Although Mr. Spencer "documented" the ten incidents and used them in the termination hearing before the County Board, he did not share with Mrs. Maxey any written warning, criticism, or a suggested improvement plan. In the "observations" discussed below in this opinion, the substance of some of the ten incidents appear as "observations." During the hearing before the McDowell County Board of Education, Mr. Spencer explained that he began this "documentation" in September 1996, when Appellant "appeared to be unnerved" about classroom scheduling issues. When Mr. Spencer asked her to refrain from approaching him about such issues while students were present, Mr. Spencer stated that the Appellant threw book bags, cried, and made a comment to the effect that she wished she would die. In October 1996, Mr. Spencer noted that the Appellant stated that if she was having a bad day, she might consider jumping out a window and giving the proceeds to her children. In October 1996, Mr. Spencer saw the Appellant and her classroom students in the hallway. The Appellant explained that she had permitted the students to accompany her on an errand since they had been demonstrating excellent classroom behavior. Mr. Spencer disapproved of the Appellant's techniques and instructed her to take her students back to the classroom. Mr. Spencer also saw the Appellant moving a locker by herself when she was making

### A. November 1996

Mr. Spencer observed the Appellant's classroom behavior on November 18, 1996. Of some forty-five categories available on the observation form, Mr. Spencer entered comments in only five areas, each of the five paralleling five of the "incidents" he had "documented" and later used at the termination hearing.[3] The record contains no explanation of why Mr. Spencer did not record his evaluation in any of the other forty categories. The observation form ends with spaces available for the signatures of the evaluator and the employee being observed, and this notice: "Signing this observation form indicates only that the employee has had an opportunity to confer with the evaluator regarding its contents."

The Appellant testified that the observation form was presented to her by Mr. Spencer in a November 1996 conference which occurred approximately two hours after the normal school day when the Appellant was preparing to leave school to drive to Princeton, West Virginia, to visit her mother in the hospital. She said of that conference that Mr. Spencer "considered it communication. But he presented me this. He pre-

a transition between two classrooms. He disapproved of her denial of offers of assistance from two other individuals, explaining, "I thought, in my judgment, it was poor judgment to pull a heavy cabinet by herself to do this." Also in October 1996, Mr. Spencer made notes to himself concerning the Appellant. These notes included issues of communication with co-workers, parents, and administrators; complaints about issues such as "lesson plans, goals, objectives for county testing, grading papers, monitoring paperwork for special education and being overloaded for the past two years while being a seventh/eighth grade teacher. She had thirty-four, thirty-five students...."

**3.** Mr. Spencer also accused the Appellant of calling him "Napoleon," which the Appellant denies. Included in Mr. Spencer's observations was his opinion that the Appellant needed to improve her communication skills when speaking to parents. The Appellant had allegedly fallen to her knees during an emotional parent-teacher conference in which a mother had requested an explanation for how her special education child had two red marks around his neck area. The record reflects no explanation for those red marks, and the issue was not developed in the proceedings below.

sented a listing. At the end of the conference he said, 'Do you or do you not want to sign?' I said, 'Sir, I do not want to sign this because I could not understand his needs assessment that he wished to attach.'" The needs assessment Mrs. Maxey referred to in that response is omitted from the exhibit in the record containing the observation form. Accordingly, there is no basis in the record for challenging the propriety of Mrs. Maxey's decision not to sign an observation form she did not understand. Moreover, the record reflects no warning, admonition, or other formal statement to the Appellant in response to her refusal to sign the observation form.

## B. March 1997

On March 3, 1997, Mr. Spencer again observed the Appellant's classroom conduct for approximately thirty minutes, and the resulting observation form was presented to the Appellant on March 4, 1997, for her signature. A careful review of that form yields two relevant impressions. First, Mrs. Maxey's performance in her profession of teaching continued to be exemplary. Favorable comments are recorded even in areas where the ten "documented" instances upon which Mr. Spencer later relied could fairly be said to raise doubts about Appellant's performance. For instance, it was observed on March 3, 1997, that Mrs. Maxey maintained proper discipline in the classroom, treated students well, had a prepared lesson plan, provided individual help to students and otherwise met expectations in some twenty-five categories.

Nevertheless, Mr. Spencer had certain attachments to the observation form (again, not in the record) which he undertook to explain to Mrs. Maxey when he presented the observation form to her the next day, March 4. In his testimony before the County Board, Mr.

Spencer described the criticisms listed in the attachment.[4] A close reading of those criticisms indicates that they are at variance with Mr. Spencer's recorded classroom observations of Mrs. Maxey's class conduct and that the majority of them relate either to events that occurred prior to the March 3 observation or matters that did not occur in the classroom.

The Appellant testified that she was not provided an adequate opportunity to discuss the criticisms prior to being asked to sign the evaluation document. She explained that Mr. Spencer read the list to her and "he immediately jumped up, very abruptly, and said, 'I have to go for lunch duty.'" As he walked toward the door, the Appellant testified that she began looking over the proposed attachment listing deficiencies to attempt further discussion. The Appellant contends that the wind from the open window blew the observation form on the floor and she placed her foot on the paper to prevent it from blowing away. However, Mr. Spencer maintains that the Appellant stomped on the observation form and refused to sign it. Again, the observation form at issue here contains the comment that signing the form merely records that the employee had an opportunity to discuss the form with the evaluator. Beyond question, the March 4 conference did become acrimonious. Mr. Spencer concluded that Appellant had intentionally "stomped" on the form; Appellant, for her part, testified that she asked Mr. Spencer what he had "against myself or my family because I have nothing against you or yours." Appellant testified that Mr. Spencer then immediately left the room to attend lunch duty. Mr. Spencer testified that he had indeed left for lunch duty, explaining that "I saw more confrontation, and I tried to

4. Mr. Spencer's description of the issues contained in the attachment consisted of the following:

Okay, take students assigned to the four/five split classroom when the music teacher, Title I teacher or special education teacher are not able to instruct or supervise students, excessive number of students out of their seats during the instructional day, which promotes different problems, and there were discipline problems, and I was trying to help her with those (4)

Parent complaints about discussing everyday routine discussions, which should be normal for parent/teacher relationships; example, 3–4-97, Ms. Dawson did ask you about midterms and for grades and she'd just seen her a few minutes previously, (5) Don't make negative remarks to Mr. Spencer, especially, when in the presence of students, example, 3–3–97, promoting—that I was promoting a laid-back atmosphere and private office—that I was— her class was an administrative failure.

avoid confrontation." Clearly, at this point, there was not mutual trust and confidence between Mr. Spencer, as the school's principal, and Mrs. Maxey, as one of the school's veteran teachers, and there was a substantial, perhaps mutual, inability or unwillingness to communicate.

Mr. Spencer provided the Appellant with a clean copy of the observation document two days later, on March 6, 1997, and the Appellant again declined to sign the document. The Appellant testified that she was not commanded to sign the document, that Mr. Spencer simply gave her the option to sign or not to sign. She chose not to sign, she said, since she had not been given an adequate opportunity to discuss the allegations with Mr. Spencer. Mr. Spencer did inform the Appellant that she would have to appear before the Board of Education in Welch, West Virginia, if she continued to refuse to sign the document. The Appellant replied with a comment concerning her willingness to draw Mr. Spencer a map to Welch.

C. Meeting with School Superintendent

Consequently, without the Appellant's knowledge, Mr. Spencer arranged a meeting with Dr. Kenneth J. Roberts, the School Superintendent, and Mr. Larry Lane, the Assistant Superintendent, to be conducted on March 7, 1997. The Appellant contends that she was not informed of the purpose or possible consequences of that meeting beforehand. The Appellant's husband, Silas Maxey, another teacher in McDowell County, was asked to transport the Appellant to Welch for the meeting.[5] The Appellant did not learn when the Welch meeting was to be held until Mr. Spencer arrived at her classroom on March 7, 1997, and ordered her to his office, where Mr. Maxey was waiting. Mr. Spencer testified as follows about going to her classroom that morning:

> [A]nd I walked in and asked her to come into the office, and at that time, I told her—She called me "Napoleon" and then, I

moved back behind my desk. I—I was very—After she was telling me to get a roadmap the previous day, I knew that there was nothing good going to be said, and I didn't want to say anything to Mrs. Maxey. I had fear. I can't say who else did, but I was afraid to go to work that morning. . . .

Four individuals were in attendance at the March 7, 1997, meeting. These included the Appellant, Mr. Spencer, Dr. Roberts, and Mr. Lane. Dr. Roberts testified at one point that he stated the purpose of the meeting to Mrs. Maxey as follows:

> I told Mrs. Maxey at the beginning of that that the purpose of the conference was to try to address what had taken place and to see what steps needed to be taken, if any, in terms of whether there were some concerns or problems that she had that needed to be addressed or what we needed to do.

After that, during the first forty-five minutes of the over two-hour meeting, Mr. Spencer itemized his observations of the Appellant's behavior from the documents the Appellant had refused to sign. The Appellant asserts that she was not permitted a reasonable opportunity to participate in any discussion of the issues surrounding her alleged performance deficiencies. She testified that Dr. Roberts prohibited her from interjecting responses to Mr. Spencer's allegations and that Dr. Roberts had asked her to wait until the conclusion of Mr. Spencer's comments.[6] The Appellant testified that the individuals conducting the supervisors meeting were "treating a woman as an inanimate object" and that she felt like a "caged animal."

When Dr. Roberts informed the Appellant that she must sign the observation form to prevent disciplinary action, the Appellant directed a comment toward Mr. Spencer, the exact wording of which differs among the testimony of the various witnesses. Mr.

---

5. Mr. Maxey was contacted at his school at approximately 7:45 a.m. on the morning of March 7, 1997, by Mr. Lane. Mr. Maxey testified that Mr. Lane said, "Your wife and Mr. Spencer have just had another incident." Mr. Maxey was then asked to transport his wife to Welch since school

officials were aware that Mr. and Mrs. Maxey routinely drove to work together.

6. The Appellant testified: "Each time I saw that I wasn't going to get to speak and communication to them meant a one-way street."

Spencer testified that the Appellant told him, "'I should have blown your head off with a shotgun' instead of signing this observation." Mr. Spencer further testified that such comment alarmed him and that he consequently exited the meeting for approximately fifteen to twenty minutes. He testified that upon his return to the meeting, the Appellant informed him, "[I]f I was going to blow your head off, I would have already done it." Mr. Spencer testified that he thereafter left the meeting and did not return.

The Appellant testified that she actually said, "[H]ad I shot you, I would have been in less trouble. I would have been over in the jail and the taxpayers would have been supporting me and I wouldn't have been worried about my employment." She acknowledged that she had made inappropriate comments to Mr. Spencer during the meeting and explained that she was sorry that she had made such comments, but explained that her statements were prompted by her emotional state and her frustration with the absence of opportunity to defend herself against Mr. Spencer's barrage of allegations. She further testified that she intended no harm to Mr. Spencer. She testified that the statements "were off the top of my head because when you're backed into a corner, a caged animal has to defend themself some way and that was my outlet of letting these gentlemen know that I needed fair play. There was no harm intended. A lot of times, I will make offhanded, deprecating comments in order to get the other person to listen. That is a method of advertisement, is it not?" Mr. Lane testified that he remembered only one reference to any shooting, wherein the Appellant stated, "I should have got a gun and blown your head off." Dr. Roberts testified that the Appellant said, "Well, I might as well have taken a gun and shot his head off."

Dr. Roberts also testified that the Appellant's comments prompted him to inform the Appellant that he was going to recommend a suspension and termination of her employment on the basis of insubordination. He explained that her behavior during the meeting had demonstrated that the basis for Mr. Spencer's complaints against her were legitimate. Dr. Roberts further explained that he asked his secretary to call 911, due to the high levels of stress in the conference. A police officer arrived at the building and sat near the closed door until the four participants exited sometime after 11:00 a.m. In the interim, Dr. Roberts dictated and delivered a letter to Mrs. Maxey, which contains his statement of the charges against her and includes the statement, which he later confirmed in testimony, that the entire purpose of the meeting was to determine if Mrs. Maxey had been insubordinate. The notice letter reads as follows:

On Friday, March 7, 1997, a conference was conducted with you, Mr. James Spencer, Mr. Larry Lane, and myself. The purpose of this conference was to address your behavior and charge of insubordination in throwing your observation on the floor, stomping it, and refusing to sign it. During this conference you showed a great degree of intemperance including threatening your own life and threatening to shoot Mr. Spencer in the head.

Therefore, due to continued acts of disrespect, these specific incidents of insubordination, and your demonstrations of intemperance you are being suspended for thirty days and recommended for dismissal as per WV Code 18A–2–8. I intend to make this recommendation at the McDowell County Board of Education regular meeting scheduled for Monday, March 17, 1997.

A hearing before the McDowell County Board of Education concerning this action will be held at the above meeting prior to the above recommendation being made. You may be represented by council [sic] or anyone of your choosing if you so desire. Please confirm in writing with me by Friday, March 14, 1997 if you plan to attend this hearing.

Mrs. Maxey described her emotional state by the end of the meeting, testifying that she made a comment about leaving by climbing through a window and that she was so humiliated that "rather than having my husband drug through an embarrassing situation, I would have gone out the window, the back door, the floor." Dr. Roberts obviously appreciated Mrs. Maxey's stress; he later testi-

fied that he called 911 after he decided to recommend dismissal, saying: "I wasn't really concerned with my safety. I was more concerned, probably, with hers. . . ." In that same vein, Appellant's husband testified that Dr. Roberts had approached him after the meeting and had informed him that he thought the Appellant needed psychiatric help. Mr. Maxey testified that Dr. Roberts also told him that his wife had made threats against Mr. Spencer, but that Dr. Roberts said, " 'I'm sure that she wouldn't have." ' Mrs. Maxey later testified that she had been engaged in "constant psychological counseling" and had been taking medication since the incident.

### D. Termination and Procedural Chronology

The County Board consequently terminated the Appellant's employment, on the basis of intemperance and insubordination. The Grievance Board upheld the decision to terminate the Appellant's employment, making extensive findings of fact and conclusions of law, concluding, *inter alia*, that the County Board's termination was based exclusively upon the Appellant's alleged insubordination.[7]

The lower court upheld the Grievance Board's determination, by order dated March 30, 2001.[8] On appeal, the Appellant asserts that the lower court erred in upholding the finding that the County Board met its burden of showing good cause for her termination. She further contends that the County Board failed to consider mitigation of penalty, based upon the fact that the Appel-

lant had maintained an extensive and commendable work performance history with no prior record of disciplinary action and that she was emotionally distraught over her mother's death.[9]

### II. Standard of Review

■■■ In syllabus point one of *Parham v. Raleigh County Board of Education,* 192 W.Va. 540, 453 S.E.2d 374 (1994), this Court explained that " '[a] final order of the hearing examiner for the West Virginia Educational Employees Grievance Board, made pursuant to W.Va.Code, 18–29–1, *et seq.* (1985), and based upon findings of fact, should not be reversed unless clearly wrong.' Syl. pt. 1, *Randolph County Board of Education v. Scalia,* 182 W.Va. 289, 387 S.E.2d 524 (1989)." With regard to issues of statutory application or issues of law, however, a *de novo* standard of review applies. As this Court explained in syllabus point one of *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995), "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving the interpretation of a statute, we apply a *de novo* standard of review." *See also Ewing v. Board of Educ. of County of Summers,* 202 W.Va. 228, 503 S.E.2d 541 (1998); Syl. Pt. 1, *University of West Virginia Board of Trustees ex rel. West Virginia University v. Fox,* 197 W.Va. 91, 475 S.E.2d 91 (1996). In syllabus point one of *Cahill v. Mercer County Board of Education,* 208 W.Va. 177, 539 S.E.2d 437 (2000), this Court explained:

Grievance rulings involve a combination of both deferential and plenary review.

---

7. In footnote two of the administrative law judge's order, the charges of insubordination as well as intemperance were addressed as follows: "Although Grievant's conduct was originally characterized by MCBE as 'intemperance,' as well as insubordination, it appears that MCBE terminated Grievant on the basis of insubordination alone, and whether Grievant was 'intemperant' in the circumstances presented does not need to be further addressed." Dr. Roberts initially stated that the Appellant committed intemperance, a term commonly reserved for imbibing alcoholic beverages but used more generally here in description of the lack of verbal self-restraint, by threatening Mr. Spencer. Dr. Roberts further stated that the insubordination claim was founded in the Appellant's action of throwing the observation form on the floor, stomping it, and refusing to sign it. As the administrative law

judge observed, the intemperance component of the claim was abandoned, and the actions of the Appellant were generically referenced as insubordination.

8. The order affirming the hearing examiner was entered by Judge Murensky without hearing, based upon findings and conclusions formulated by Judge King, not confirmed by an order prior to the expiration of Judge King's term.

9. The Appellant's mother had suffered a disabling stroke in December 1991, and the Appellant was her primary care giver until her death in January 1997. The Appellant's father-in-law died in December 1996, and an uncle died in January 1997.

Since a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge, a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Credibility determinations made by an administrative law judge are similarly entitled to deference. Plenary review is conducted as to the conclusions of law and application of law to the facts, which are reviewed de novo.

Consequently, we review *de novo* the application of the law to the facts as determined by the lower court, recognizing that the lower tribunals were in a position to most accurately adjudge the credibility of the witnesses. *See Michael D.C. v. Wanda L.C.*, 201 W.Va. 381, 388, 497 S.E.2d 531, 538 (1997); *Gum v. Dudley*, 202 W.Va. 477, 484, 505 S.E.2d 391, 398 (1997).

### III. West Virginia Code § 18A–2–8 and Board of Education Policy 5300

West Virginia Code § 18A–2–8 (1990) (Repl.Vol.2001) enumerates the reasons for which a teacher may be suspended or dismissed and states in relevant part as follows:

Notwithstanding any other provisions of law, a board may suspend or dismiss any person in its employment at any time for: Immorality, incompetency, cruelty, insubordination, intemperance, willful neglect of duty, unsatisfactory performance, the conviction of a felony or a guilty plea or a plea of nolo contendere to a felony charge. A charge of unsatisfactory performance shall not be made except as the result of an employee performance evaluation pursuant to section twelve of this article. The charges shall be stated in writing served upon the employee within two days of presentation of said charges to the board.

■ This Court has previously held that a teacher may only be dismissed for the reasons specifically enumerated in that statute. In syllabus point three of *Beverlin v. Board of Education*, 158 W.Va. 1067, 216 S.E.2d 554 (1975), we held that "[t]he authority of a county board of education to dismiss a teacher under *W.Va.Code* 1931, 18A–2–8, as amended, must be based upon the just causes

listed therein and must be exercised reasonably, not arbitrarily or capriciously." *See also* syllabus, *Meckley v. Kanawha County Bd. of Educ.*, 181 W.Va. 657, 383 S.E.2d 839 (1989); syl. pt. 2, *Totten v. Board of Educ.*, 171 W.Va. 755, 301 S.E.2d 846 (1983); *DeVito v. Board of Educ.*, 169 W.Va. 53, 285 S.E.2d 411 (1981).

In addition to the statute quoted above, the Appellant relies upon the provisions of West Virginia Board of Education Policy § 5300(6)(a), 9 W.Va.C.S.R. § 126–141–2.6, which provides in pertinent part as follows:

Every employee is entitled to know how well he/she is performing his/her job, and should be offered the opportunity of open and honest evaluation of his/her performance on a regular basis. Any decision concerning promotion, demotion, transfer or termination of employment should be based upon such evaluation, and not upon factors extraneous thereto. Every employee is entitled to the opportunity of improving his/her job performance, prior to the terminating or transferring of his/her services, and can only do so with the assistance of regular evaluation.

Section 2.7 further provides: "Every employee is entitled to 'due process' in matters affecting his/her employment, transfer, demotion or promotion."

■ This Court addressed the mandatory requirements of Policy 5300 in syllabus point three of *Trimboli v. Board of Education*, 163 W.Va. 1, 254 S.E.2d 561 (1979), as follows:

Failure by any board of education to follow the evaluation procedure in West Virginia Board of Education Policy No. 5300(6)(a) prohibits such board from discharging, demoting or transferring an employee for reasons having to do with prior misconduct or incompetency that has not been called to the attention of the employee through evaluation, and which is correctable.

In *Mason County Board of Education v. State Superintendent of Schools*, 165 W.Va. 732, 274 S.E.2d 435 (1980), the Court elaborated upon these principles as follows:

[A] board must follow the § 5300(6)(a) procedures if the circumstances forming the

basis for suspension or discharge are "correctable." The factor triggering the application of the evaluation procedure and correction period is "correctable" conduct. What is "correctable" conduct does not lend itself to an exact definition but must . . . be understood to mean an offense or conduct which affects professional competency.

*Id.* at 739, 274 S.E.2d at 439; *see also Rovello v. Lewis County Bd. of Educ.*, 181 W.Va. 122, 381 S.E.2d 237 (1989). In syllabus point three of *Mason County*, this Court explained: "The procedures specified in West Virginia Board of Education Policy No. 5300(6)(a) must be followed in every proceeding under *W.Va.Code* 18A–2–8 [1969] for the dismissal of a school employee on the ground of incompetency." The Court continued in syllabus point four: "It is *not the label* given to conduct which determines whether § 5300(6)(a) procedures must be followed but whether the conduct forming the basis of dismissal involves professional incompetency and whether it directly and substantially affects the system in a permanent, noncorrectable manner." *Mason County* at 732, 274 S.E.2d 435 (emphasis supplied).

In *Holland, v. Board of Education of Raleigh County*, 174 W.Va. 393, 327 S.E.2d 155 (1985), this Court attempted to reconcile the statutory and policy requirements, as they relate to charges of insubordination, reasoning as follows:

Clearly, a charge of "insubordination" is a charge of prior misconduct. Therefore, Policy No. 5300(6)(a), as construed by this Court in Syllabus Point 3 of *Trimboli*, should have been followed. As we noted in Syllabus Point 4 of *Mason ·County Board of Education v. State Superintendent of Schools, supra*, it is the conduct forming the basis for action and not the label placed on such action that is determinative. The superintendent admitted several times at the transfer hearings before the Board that Policy No. 5300(6)(a) was applicable, but he maintained that its observance was the responsibility of the Board.

174 W.Va. at 395, 327 S.E.2d at 157.

IV. Application of Principles of Policy 5300

■ We find that Policy 5300 was controlling in the present case, and the Board of Education failed to comply with the specific requirements of that policy. This began as a personality conflict between a teacher and a principal and escalated grievously from that point. The record strongly suggests that the Appellant had recently completed serving for over five years as a principal caretaker for her disabled mother, followed by her death, and endured almost contemporaneously the loss of her father-in-law and an uncle. After about sixteen years as a satisfactory employee, with good evaluations, a series of truly bizarre events occurred. The record also strongly suggests that the new principal simply could not deal with the early manifestations of this behavior except to set upon a course of "documenting" conduct he found objectionable and conducting two formal classroom observations. Even the actual records of these evaluations, and particularly the later one, recite in glowing detail a teacher who functioned in the classroom with considerable skill and substantial caring for her students.

The schoolhouse conference which followed the March 3, 1997, observation by the principal and its follow-up events could be seen as a "comedy of errors" were not the impact on the parties so serious. It is beyond cavil that the principal terminated the conference in order to go to "lunch duty" before any meaningful discussion of the criticisms contained in the attachment to the observation form could be had, thus relieving the teacher of any responsibility to sign the form at that time. Assuming, *arguendo*, that the teacher "stomped" on the form, such childish conduct cannot be condoned. The same can be said of the presentation of a new, clean form two days later. No meaningful discussion of the attachment had yet been had; the insistence by the principal that the teacher was then required to sign the form despite the absence of a meaningful conference is just plain erroneous. Again, the follow-up comment by the teacher that she would draw the principal a map to Welch was wholly uncalled for. The events at the school on the next day border on the ridiculous. The principal requests the teacher's husband to drive her to Welch,

taking him from his teaching duties at another school. The principal acknowledges that he is in "fear" and "afraid to come to work" that morning, and had been all morning, apparently in contemplation of getting the teacher to Welch and having a conference with her and with his superiors. It is not clear whose professional performance was more disappointing.

Once at the meeting in Welch, the Appellant was told she had been summoned to the Board Office for the ostensible purpose of addressing her alleged classroom and communication deficiencies, as well as her decision not to sign the observation form. It does not appear that a "discussion," as that term is commonly defined, occurred concerning her decision not to sign the observation form, or the lack of communication, or the perceived performance inadequacies. The record does not disclose an *exchange* of ideas or a *responsive dialogue* in which each party was provided the opportunity to state his or her own analysis of the issues. Indeed, it appears that the purpose of the meeting was to compel the teacher to sign the observation form, or, in the words of Dr. Roberts, be disciplined-that is, ultimately charged with insubordination and dismissed. Under stress, conscious of her husband waiting in the outer office, the teacher claimed she felt like a "caged animal," ready to exit by a back door or even a window. Dr. Roberts directed her to sign the observation form or face discipline.[10] Dr. Roberts recognized her stress sufficiently to call for police assistance, but failed to address the issue of whether any of the teacher's bizarre conduct could be corrected under an improvement plan.[11]

With regard to the most difficult part of the meeting, Appellant's comment or comments directed toward Mr. Spencer, while certainly emotional outbursts containing inappropriate similes, were not genuine threats to physical safety. Black's Law Dictionary 1489 (7th ed.1999) defines a "threat" as "[a] communicated intent to inflict harm or loss on another or on another's property." An assault is "the threat to do violence. . . ." *State v. Cunningham*, 160 W.Va. 582, 593, 236 S.E.2d 459, 465 (1977) (Miller, J., dissenting); *see also* 6 Am.Jur.2d Assault and Battery § 94 (discussing fact that an assault must involve a threat to cause immediate injury, rather than future injury). A comment that an individual should have done some act in the past could not be construed as either civil or criminal assault. *See* W.Va. Code § 61-2-9 (1980) (Repl.Vol.2000) (defining criminal assault).

Mr. Spencer's emotional response, leaving the meeting twice, the second time, never to return, together with his testimony that earlier in the day he was "in fear" and "afraid to come to work" suggests that more than one person attending the meeting had issues of emotional stability with which to deal that very well might affect job performance. Mrs. Maxey's comments regarding being better off if she had shot Mr. Spencer were definitely inappropriate; what followed immediately was the decision to seek termination of her employment, without any attempt to correct her performance deficiencies, or at least, determine if they were correctable.

The record clearly reflects that initial confrontations between the Appellant and her supervisor were primarily performance related and reflected personality conflict and the absence of constructive communication. The insubordination claim was derivative of the original performance issue. In other words, the emergence from the performance issue of

---

10. Since the sole purpose of signing the form is to *acknowledge* that an opportunity had been afforded to discuss the comments on the form, it is difficult to understand how one who believes such an opportunity has not been afforded is subject to discipline for not signing the form. More to the point, what affront occurred when the teacher refused in the presence of three superiors, who could easily establish if it were so, that the teacher had refused after being afforded the opportunity to discuss the observation comments.

11. Dr. Roberts testified: "I told Mrs. Maxey that that was it; that I was going to recommend suspension and a recommendation to the Board that she be dismissed because I felt the she was unwilling to address the charges made by her immediate supervisor and had demonstrated that the charges that he was making were, by her behavior in my office, you know, correct."

a secondary acts, allegedly constituting insubordination, cannot be held to totally eclipse the underlying performance issues and cannot subvert the employee's right to the protections of Policy 5300. By permitting the insubordination claim to overshadow the performance-related issues and form an entirely separate and distinct basis for termination, the Board has simply chosen to label the conduct as insubordination and has thwarted the purpose of Policy 5300. As we succinctly stated in *Mason County*, it is not the label, but rather the conduct itself, which determines the applicability of Policy 5300. 165 W.Va. at 732, 274 S.E.2d at 439.

Two indispensable things should have occurred in this case: first and foremost, the central issues of the Appellant's performance in the classroom and communication between teacher and principal should have been meaningfully deliberated upon. They were not. Second, discussions should have ensued regarding whether the Appellant's allegedly adverse behavior was correctable, as mandated by Policy 5300, *Trimboli*, and its progeny. That did not occur.

No inquiry was undertaken, at any level of this ordeal, to ascertain why a veteran teacher of seventeen years with an exemplary record suddenly committed acts which the Board found intolerable and worthy of a letter of termination. Consideration was not given to any blame to be attributed to Mr. Spencer for his limited communication skills, his distinct fear of confrontation, or his failure to address his concerns in a more constructive posture. Consideration was not given to the role of psychological turmoil, mental exhaustion, and recent bereavement.[12] The principles of Policy 5300 were ignored by the Board of Education, the Grievance Board, and the lower court.

We do not sanction in the least the Appellant's comments toward Mr. Spencer; or irrational behavior such as falling to ones knees in class or parent-teacher conferences and other such stress or anger-related conduct, nor do we believe that a teacher exhibiting irrational behavior should remain in the classroom. However, an improvement period is designed to address just such a problem. Policy 5300 envision that where a teacher exhibits problematic behavior, the improvement period is the appropriate tool if the conduct can be corrected. Only when these legitimate efforts fail is termination justified. Perhaps change will prove impossible in this case, and the Appellant could quite possibly be subjected to termination once again. But, that is not our question. Our task is to determine whether the law was properly applied. It was not.

### V. Conclusions

■ Based upon the foregoing, we hold that the failure to pursue the question of whether these performance deficiencies could be corrected and an improvement plan prepared for that purpose, violated Policy 5300, and is contrary to our cases interpreting its interplay with West Virginia Code § 18A–2–8. We find further that the Grievance Board abused its discretion in not addressing that issue, and the circuit court committed error in affirming Mrs. Maxey's dismissal in the absence of adherence to Policy 5300. "School personnel regulations and laws are to be strictly construed in favor of the employee." Syl. Pt. 1, *Morgan v. Pizzino*, 163 W.Va. 454, 256 S.E.2d 592 (1979). As this Court plainly stated in *Wilt v. Flanigan*, 170 W.Va. 385, 294 S.E.2d 189 (1982), "[t]he provisions of 5300(6)(a) must therefore be strictly construed in favor of the appellant to ensure that she received the full guarantee of protection intended to be encompassed by the policy promulgated by the West Virginia Board of Education." 170 W.Va. at 390, 294 S.E.2d at 194. The *Wilt* Court concluded: "A cloud was cast upon the appellant's due process rights and we must remove this cloud." *Id.* at 392, 294 S.E.2d at 195; *see also Lipan v. Board of Educ.*, 170 W.Va. 553, 295 S.E.2d 44 (1982) (finding lack of open and honest evaluation a violation of Policy 5300).

■ We further hold that where it is clear that the underlying complaints regard-

---

12. In that vein, we also note that the inquiry is not whether these emotional issues would typically cause such extreme agitation; rather, it is whether the Appellant's behavior was affected by these emotional issues.

ing a teacher's conduct relate to his or her performance as a teacher, including the relationship with supervisors, the effect of West Virginia Board of Education Policy 5300 is to require an initial inquiry into whether that conduct is correctable. Such inquiry is utterly absent in the present case; the question of whether this behavior was correctable is not addressed at any point in this record.

We therefore reverse the termination decision and remand the matter to the Grievance Board for further proceedings. Upon remand, the Grievance Board, after taking of such evidence as may bear on the issue, shall determine whether or not the conduct of the Appellant is correctable under a feasible improvement plan. We cannot assert that the actions of the Appellant, in failing to demonstrate an appropriate level of respect for her supervisor, in interrupting and arguing with him, and in making bizarre comments concerning shooting him, did not constitute insubordination. However, it does not appear that insubordination occurred in the act of failing to sign observation forms, where a signature clearly was intended as an acknowledgment that the individual had been provided with the opportunity to discuss and understand the criticisms or comments contained therein.

On remand, the County Board shall have the burden of showing that such conduct was not and is not correctable. Upon determining the issue, the Grievance Board shall reinstate the termination if the conduct is found not correctable; if found correctable, the Board shall endorse an appropriate improvement plan. If the Appellant is shown to be prepared to return to the classroom forthwith, it may be so ordered. Alternatively, the Grievance Board may order reinstatement at such future stage in the improvement plan as permits the return of the Appellant to the classroom with the stress and anger-control issues under reasonable control. The Appellant's reinstatement as a

classroom educator may be conditioned upon satisfactory completion of the any such initial requirements in a fair and reasonable improvement period and reinstatement shall anticipate that Appellant will carry out the remainder of the improvement plan after reinstatement.

 On remand, the lower court should also address the issue of the Appellant's possible entitlement to an award of back pay, to be calculated by the Grievance Board. The proper amount of the award should be determined by consideration of the Appellant's lost wages until she obtained comparable employment; in the event it appears that she was medically unable able to obtain comparable employment, back pay should be calculated, if at all, only from the date that it appears that she became capable of returning to the classroom free of the stress and anger-control issues that gave rise, at least in part, to her conduct discussed in this opinion, all reduced by any interim part time wages received outside the times Appellant was unavailable for work due to her mental state.[13] As this Court stated in syllabus point two of *Mason County Board of Education v. State Superintendent of Schools,* 170 W.Va. 632, 295 S.E.2d 719 (1982),

Unless a wrongful discharge is malicious, the wrongfully discharged employee has a duty to mitigate damages by accepting similar employment to that contemplated by his or her contract if it is available in the local area, and the actual wages received, or the wages the employee could have received at comparable employment where it is locally available, will be deducted from any back pay award; however, the burden of raising the issue of mitigation is on the employer.

The limited statutory attorney fees prescribed in West Virginia Code § 18-29-8 (1992) (Repl.Vol.1999)[14] should also be considered and ordered as appropriate.

---

**13.** The Appellant testified at the Level IV hearing that she was still undergoing psychological counseling and was taking medication. Thus, her availability to work during such periods would be a legitimate area of inquiry for the grievance board in determining any back pay award.

**14.** West Virginia Code § 18-29-8 provides as follows:

Any expenses incurred relative to the grievance procedure at levels one through three shall be borne by the party incurring such expenses except as to the costs of transcrip-

Based upon the foregoing, the final order of the Circuit Court of McDowell County is hereby reversed, and this matter is remanded to the Grievance Board for further evaluation consistent with this opinion.

Reversed and Remanded with directions.

Justice MAYNARD dissents and reserves the right to file a dissenting opinion.

MAYNARD, Justice, dissenting.

(Filed Dec. 6, 2002)

I wonder just what a teacher has to do to be insubordinate in West Virginia schools today. Apparently, threatening to shoot or kill the principal is not enough. Throwing an observation form on the floor and stomping on it is not enough either. Nor is repeatedly refusing to sign that form.

I dissent in this case because, unlike the majority, I believe that Mrs. Maxey's termination was based on "insubordination" and not "performance." The majority states that "the insubordination claim was derivative of the original performance issue." However, the record shows otherwise.

As mentioned hereinabove, Mrs. Maxey demonstrated an ongoing and persistent course of insubordination throughout the school year which culminated with the events that occurred on March 7, 1997. In particular, Mrs. Maxey was insubordinate when she refused to sign the teacher observation forms presented to her by her principal, Mr. Spencer. She was also insubordinate when she threw one of the observation forms on the floor and stomped on it. She was further insubordinate at the conference which occurred on March 7, 1997.

At the March 7, 1997 conference, Mrs. Maxey again flatly refused to sign the observation forms even though she was advised that serious consequences could result from her failure to do so. She also made inappropriate comments to her supervisors throughout the conference, the most egregious of

which was the comment to Mr. Spencer, as reported by at least two of those present, that she "should have blown [his] head off with a shotgun." Mrs. Maxey maintains that she actually said, "Mr. Spencer, had I shot you, I would have been in less trouble. I would have been over in jail and the taxpayers would have been supporting me and I wouldn't have been worried about my employment." Even if one believes Mrs. Maxey's version of what she said, it is still very violent, chilling, and threatening. Furthermore, it is certainly language that simply has no place in our schools.

Given these facts, I believe the McDowell County Board of Education acted reasonably in terminating Mrs. Maxey's employment for insubordination. While I understand that Mrs. Maxey is a veteran of the McDowell County school system and has a record of excellent evaluations, her experience does not excuse her conduct. It is an unfortunate fact that in today's world, the possibility of shootings in the workplace and in our schools has become a frightening reality. Mrs. Maxey's comment that she should have shot Mr. Spencer in the head cannot be excused or overlooked, especially in light of her other repeated acts of gross insubordination. W.Va.Code § 18A–2–8 (1990) provides that a teacher may be dismissed at any time for insubordination. In that instance, Policy 5300 does not apply.

The majority has remanded this case for a hearing to determine whether Mrs. Maxey's conduct is "correctable" under a feasible improvement plan. In the event that Mrs. Maxey's actions are "found correctable" and she is allowed to return to the classroom, the majority has ordered that she be granted back pay. Without a doubt, I believe Mrs. Maxey will be reinstated. Consequently, she will be handsomely rewarded for her violent misconduct and gross insubordination. In fact, assuming Mrs. Maxey was making more than $30,000 annually, she will probably be awarded more than $180,000 in back pay for

tions as provided for in section six [§ 18–29–6] of this article.

In the event an employee or employer appeals an adverse level four decision to the circuit court or an adverse circuit court decision to the supreme court, and the employee substantially prevails upon such appeal, the employee or the organization representing the employee is entitled to recover court costs and reasonable attorney fees, to be set by the court, from the employer.

the six years she has been out of the classroom. Is this how we should handle such conduct? I don't think so.

For the reasons stated above, I would affirm the circuit court's order which upholds the termination of Mrs. Maxey's employment by the McDowell County Board of Education. Thus, I dissent from the majority's opinion in this case.

STARCHER, Justice, concurring.
(Filed Dec. 12, 2002)

As a society we expect a lot from our teachers.

We hand our children over to our teachers and expect safekeeping, encouragement, opportunities, challenges, and results.

For their every-day efforts in performing this awesome task, we pay our teachers substandard salaries. And in part to make up for the substandard salaries, we promise our teachers a reasonably high degree of job security.

If we did not do so, we would have a much harder time recruiting and retaining capable teachers.

The "cost" of a reasonably high degree of job security is that a school board, in all but the most extreme cases, MUST follow progressive discipline. That means that in the instant case, because Mrs. Maxey acted out of line, she must be disciplined appropriately AND given a meaningful opportunity to improve, to assure her employer that this sort of conduct is not likely to reoccur. To simply drop the axe on a teacher with long-time service—most of which was exemplary—is neither fair to the teacher nor the system in which she teaches.

The dissent suggests that the school board had no duty to follow progressive discipline, because Mrs. Maxey was "insubordinate." But almost any kind of conduct can be "set up" or characterized as "insubordination." As a general rule, as I see it, regardless of how the employer chooses to characterize the employee's conduct, if it is reasonably cor-rectable misconduct, progressive discipline must be followed.

Our grievance institutions and our courts must hold the line in these sorts of cases and insist that school officials adhere to the progressive discipline principle.

To do otherwise would invite abuse in administering our educational personnel system. More importantly, it would undermine one of our most important mechanisms for recruiting and keeping good teachers.[1]

---

1. If making some kind of off-hand remark about "shooting a principal" is a dischargeable offense, then I venture to say that more than a few West Virginia classroom teachers have qualified in past years. The fact is that good people who are under severe stress can get angry and afraid and say stupid things—but that is not a reason to fire them.