675 S.E.2d 907

**Norman ALDERMAN, Petitioner Below, Appellee,**

v.

**POCAHONTAS COUNTY BOARD OF EDUCATION, Respondent Below, Appellant.**

**No. 33922.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 14, 2009.

Decided Jan. 30, 2009.

 

ered. Based upon the parties' arguments,[3] the record designated for our consideration, and the pertinent authorities, we find that the circuit court erred in its conclusions. Accordingly, we reverse the circuit court's order and reinstate the ALJ's findings of fact and conclusions of law.

## I.

## FACTUAL AND PROCEDURAL HISTORY

The facts are relatively undisputed. Prior to 2006, Mr. Alderman had been an employee of the Board for twenty-six years. During that time, all of his performance evaluations had been positive and he had never been disciplined. In 2006, his current assignment was in the Central Office as a technology facilitator and home bound instructor. In Spring 2006, Pocahontas County Schools suffered a projected loss of enrollment for the upcoming school year, resulting in a need to reduce staff. Superintendent Law recommended that Mr. Alderman be transferred to a classroom teaching position. Superintendent Law testified that the reason for the transfer request was due to declining student enrollment and a desire to preserve classroom teaching positions. Mr. Alderman requested a hearing on the proposed transfer before the Pocahontas County Board of Education, which date was set for March 21, 2006.

Prior to the March 21, 2006, hearing, Mr. Alderman declared his intent to disparage Superintendent Law and Treasurer Irvine at the upcoming hearing. Mr. Alderman operates a website called "E–Tater Forum," and his purported use of the website is to "provid[e] citizens with a forum for criticizing public officials and is 'dedicated to the task of exposing dishonest [and] corrupt ... public

Howard E. Seufer, Jr., Gregory W. Bailey, Ashley P. Hardesty, Bowles Rice McDavid Graff & Love LLP, Morgantown, for the Appellant, Pocahontas County Board of Education.

Norman Lee Alderman, Marlinton, Pro Se.

Kathryn Reed Bayless, Bayless Law Firm, PLLC, Princeton, for Amici Curiae, Boards of Education for the Counties of Braxton, Greenbrier, Nicholas, Pleasants, Mason, and Wyoming.

DAVIS, Justice:[1]

The respondent below and appellant herein, Pocahontas County Board of Education (hereinafter "the Board"), appeals from an order entered October 2, 2007, by the Circuit Court of Kanawha County. In that order, the circuit court reversed the September 22, 2006, decision by the Administrative Law Judge (hereinafter "ALJ") of the West Virginia Education and State Employees Grievance Board (hereinafter "Grievance Board").[2] The circuit court concluded that the Board's termination of the petitioner below and appellee herein, Norman Alderman (hereinafter "Mr. Alderman"), was in error, reversed the ALJ's decision affirming the same, and ordered his reinstatement. In so ruling, the circuit court found that Mr. Alderman's speech was protected speech and, further, that even if the speech was not protected, that a mitigation of punishment less severe than termination should have been consid-

---

1. Pursuant to administrative orders entered September 11, 2008, and January 1, 2009, the Honorable Thomas E. McHugh, Senior Status Justice, was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing September 12, 2008, and continuing until the Chief Justice determines that assistance is no longer necessary, in light of the illness of Justice Joseph P. Albright.

2. *See* note 10, *infra.*

3. We wish to acknowledge the contribution of the following amici curiae who filed briefs in this case: Boards of Education for the Counties of Braxton, Greenbrier, Nicholas, Pleasants, Mason, and Wyoming. The jointly-filed motion and brief support the position of the Pocahontas County Board of Education. We value the amici participation and will consider their brief in conjunction with the parties' arguments.

officials.'" Prior to the transfer hearing, Mr. Alderman posted on this website the location and date of the transfer hearing, with the following statement:

> This is the night to expose the cockroaches. We'll be exposing [Treasurer] Alice Irvine and Dr. Law [Superintendent] as nothing more or less than common thieves of public money.[4] Vanreene has been asked to step aside because he is not [sic] legitimate board member.[5] Likewise I have asked Grimes to step aside because he is living in the Central District and not the northern. His wife is in the northern, his mistress in the central.

(Footnotes added).

These same allegations were reasserted orally during the transfer hearing. Despite being prompted on several occasions to address the merits of the proposed transfer, Mr. Alderman's argument never reached the substance of the issue at hand.[6] During his oral argument, Mr. Alderman alleged that the treasurer was a thief and should be removed. Mr. Alderman asserted that Treasurer Irvine had stolen money from the golf team. He stated to her that she had "stolen and thieved and lied enough. You are on trial, my lady." He further alleged that one of the Board members was an adulterer who no longer lived in the appropriate district because he now lives with his mistress, and therefore, failed the residency requirement. Specifically, Mr. Alderman stated to the Board member that he "has no authority to sit at this table because he's an adulterer." Regarding Board member VanReenen's authority, Mr. Alderman stated that "[h]e is an imposter. He has no place at the table." During its deliberation, the Board ultimately

approved the transfer requested by Superintendent Law.

Following the transfer hearing, Mr. Alderman posted on his public website that

> We did have an opportunity to expose Alice Irvine [sic] for what she really is! Alice is not used to people being truthful with her! She and Dr. Law took the kids['] golf money for equipment and gave it to Jimmy Cutlip for gas, food and mileage. SOMETIME'S [sic] WRONG.
>
> Dr. Law is Alice's lapdog.
>
> We did get a chance to expose Emery Grimes and Tommy Vanreenen.... Both Emery and Glen [Ward?] [7] are adulterers.

(Original footnote omitted, footnote added). A meeting was held following the transfer hearing, wherein Mr. Alderman, Superintendent Law, and several administrators were present. During this meeting, Mr. Alderman was informed that Superintendent Law planned to recommend Mr. Alderman's termination for insubordination. He again accused Dr. Law of being a "thief" and a "cockroach" and further stated that Dr. Law was the "dumbest man I have ever seen." Based on all of the behavior, Superintendent Law recommended that Mr. Alderman's employment be terminated. A hearing was held on Superintendent Law's recommendation to terminate Mr. Alderman. The Board voted to terminate his employment for insubordination.

Mr. Alderman initiated an employee grievance and a hearing was held before the Grievance Board. At this hearing, Mr. Alderman did not testify and did not submit any evidence to prove his earlier-asserted allegations. The Board contended that Mr.

---

4. Mr. Alderman's assertions center around a sum of $2,500 that was granted to the golf team for equipment. Mr. Alderman alleges that the money was stolen because it was, instead, used for travel expenses for the golf team. Prior to the transfer hearing, Mr. Alderman had made these same claims. By the time of the transfer hearing, the claims had been fully investigated, and no impropriety had been found.

5. The allegations surrounding Board member VanReenen centered around an assertion that he illegally held more than one public office as he was also an alleged member of the Greenbrier Valley Soil Conservation District.

6. As asserted by Mr. Alderman, his allotted time of twenty minutes was insufficient to allow him to address all of the issues before the Board. Instead of addressing his proposed transfer, he used his time to attack the credibility of certain voting members and nonvoting participants and called into question their ability to take part in the transfer hearing.

7. It appears that Mr. Ward was also a Board employee who was accused by Mr. Alderman of sexual misconduct.

Alderman's conduct at the transfer hearing and on his website interfered with the Board's responsibilities, its members, and its administrators. Two parents who attended the open transfer hearing testified at the grievance hearing. Their testimony reinforced that Mr. Alderman's behavior had been "appalling" and "disrespectful." The parents further stated that teachers are expected to behave professionally in school and in public and that the Board must be able to conduct its affairs. The Treasurer testified that Mr. Alderman's assertions that she stole money belonging to the golf team created problems for her at church, at the grocery store, and in the community.

Following the hearing, the ALJ found that termination was appropriate due to Mr. Alderman's insubordination. The ALJ specifically found that Mr. Alderman used the transfer hearing to launch pointed personal attacks on Board members, and that he willfully and angrily disobeyed the Board's attempts to focus Mr. Alderman on the issues at hand. Particularly, the ALJ found as follows:

> There can be no question as to the fact that [Mr. Alderman's] conduct was insubordinate. At a hearing for the designated purpose of addressing his transfer, [Mr. Alderman] proceeded to ignore the issue at hand, instead choosing to launch venomous personal attacks upon various individuals present at the meeting. Although [Mr. Alderman's] counsel [8] has repeatedly emphasized the fact that [Mr. Alderman] remained seated throughout the meeting, one does not have to be physically threatening to be insubordinate. [Mr. Alderman] knew the purpose of the hearing, but chose to behave inappropriately and disrespectfully, addressing matters that had nothing to do with his proposed transfer. Moreover, a viewing of the video recording of the hearing demonstrates conclusively that [Mr. Alderman] was quite angry, aggressive, confrontational and loud throughout the proceeding. Such conduct was unnecessary, inappropriate, and without question demonstrated an extreme "contempt for authority" that is a necessary element of insubordination. After being repeatedly told that he needed to refocus his comments to address the transfer issue, [Mr. Alderman] defiantly, willfully and angrily disobeyed those directives. His conduct constitutes insubordination.

(Original footnote omitted, footnote added). Further, in response to Mr. Alderman's argument that his speech was constitutionally protected, the ALJ found as follows:

> In the instant case, the undersigned cannot find that [Mr. Alderman's] conduct constituted protected speech. The evidence in this case establishes that [Mr. Alderman] did, in fact, make his comments without consideration of the fact that they may or may not be false. As to Ms. Irvine, the issue of the golf money had been appropriately raised by [Mr. Alderman] at a previous Board meeting, and a proper investigation had been conducted. For [Mr. Alderman] to appear at his transfer hearing, shaking his finger in Ms. Irvin's [sic] face and shouting that she was a "thief" and "liar" showed a total disregard for the underlying truth of his statements, let alone his obvious contempt of authority. Moreover, [Mr. Alderman's] allegations against Mr. Grimes were, as [the Board] has noted, completely irrelevant to matters of "public concern." While the issue of Mr. Grimes' residency is certainly relevant to his ability to properly serve on the Board, angry accusations of adultery and a mistress are quite personal and appeared to have no proper foundation, if any.
>
> In addition, the undersigned finds that, in this instance, the Board's need to properly conduct its affairs far outweighs [Mr. Alderman's] right to make personal and potentially unfounded, damaging accusations against individual Board members and other Board employees. As [the Board] has argued, if every citizen of Pocahontas County believes he or she can appear at any Board meeting and angrily shout personal accusations against all parties present, the Board would have extreme difficulty conducting its assigned business of running a school system. Also, as Ms. Irvine testified, she has been publicly embarrassed and her professional rep-

---

8. While Mr. Alderman was represented by counsel at the grievance hearing before the ALJ, he does not have legal counsel appearing on his behalf before this Court.

utation compromised as a result of [Mr. Alderman's] tirade, having the potential for a tremendously negative impact upon her ability to perform her job duties. [Mr. Alderman's] "verbalization" of his overly aggressive conduct cannot excuse his misbehavior.

(Footnote omitted). In regard to Mr. Alderman's assertions that termination was too harsh of a punishment, the ALJ found that

[Mr. Alderman] has a long, productive work history and has made many positive contributions, as the Board has acknowledged. However, the personal and venomous nature of his attacks, along with the aggression and anger with which they were delivered, cannot be ignored. [The Board] has noted a concern with [Mr. Alderman's] future ability to properly interact with students, given his angry tirade, along with the impact which his conduct has had upon the Board's ability to conduct business now and in the future. Given the Board's discretion in such matters, the undersigned cannot find mitigation to be appropriate in this case.

In summary, the ALJ concluded that "[the Board] has proven by a preponderance of the evidence that [Mr. Alderman] was insubordinate, as contemplated by the provisions of W. VA. CODE § 18A-2-8." Further, the ALJ finalized the resolution of the case by finding that "[Mr. Alderman] has failed to establish that his conduct was protected speech, that he was entitled to the protections of the whistle-blower provisions, or that his punishment should be mitigated."

Mr. Alderman appealed the ALJ's decision to the Circuit Court of Kanawha County. The circuit court reversed the ALJ and ordered reinstatement of Mr. Alderman to his job. Specifically, the circuit court found "it is clear that Mr. Alderman's speech is constitutionally protected. Upholding the Board's decision to terminate him based on that speech was an abuse of discretion and the decision of the Administrative Law Judge is reversed." In so ruling, the circuit court reasoned that Mr. Alderman's speech at the

hearing and on the internet raised legitimate issues of public concern, and thus, was constitutionally protected speech. The circuit court also found that the Board offered no evidence that Mr. Alderman's speech disrupted its ability to carry out its duties. Moreover, the circuit court found that "[t]he Administrative Law Judge's decision that mediation of the severe penalty of termination was not required is arbitrary. Even if Mr. Alderman's speech had not been protected, the Board violated its policy of progressive discipline in terminating Mr. Alderman." From this order, the Board appeals to this Court.

## II.

### STANDARD OF REVIEW

■ This case comes before this Court as an appeal from the Circuit Court of Kanawha County, which reversed the decisions made by the West Virginia Education and State Employees Grievance Board. The appeal provisions of W. Va.Code § 18–29–7 (1985) (Repl.Vol.2003)[9] provide, in relevant part, that an appeal may be taken to a circuit court where the final grievance decision:

(1) was contrary to law or lawfully adopted rule, regulation or written policy of the chief administrator or governing board,

(2) exceeded the hearing examiner's statutory authority,

(3) was the result of fraud or deceit,

(4) was clearly wrong in view of the reliable, probative and substantial evidence on the whole record, or

(5) was arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

More particularly,

[g]rievance rulings involve a combination of both deferential and plenary review. Since a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge, a circuit court is not permitted to substitute its judgment for that of the hearing examiner with re-

---

9. Effective March 7, 2007, the provisions of Chapter 18, Article 29 were repealed. The provisions were recodified, without substantive changes relevant to this case, at Chapter 6C, Article 2. More specifically, W. Va.Code § 18–

29–7 is now found at W. Va.Code § 6C–2–5 (2007) (Supp.2008). This Opinion will refer to the statute as it existed at the time of the underlying action.

gard to factual determinations. Credibility determinations made by an administrative law judge are similarly entitled to deference. Plenary review is conducted as to the conclusions of law and application of law to the facts, which are reviewed de novo.

Syl. pt. 1, *Cahill v. Mercer County Bd. of Educ.*, 208 W.Va. 177, 539 S.E.2d 437 (2000).

 We also are guided by the principle that "[t]his Court reviews decisions of the circuit [court] under the same standard as that by which the circuit [court] reviews the decision of the ALJ." *Martin v. Randolph County Bd. of Educ.*, 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995). Specifically, "[a]lthough we accord great deference to the findings of fact of the West Virginia Educational Employees Grievance Board,[10] we review, *de novo,* questions of law." Syl. pt. 2, *Maikotter v. University of W. Va. Bd. of Trs.*, 206 W.Va. 691, 527 S.E.2d 802 (1999) (footnote added). Thus,

"[a] final order of the hearing examiner for the West Virginia Educational Employees Grievance Board, made pursuant to W. Va.Code, 18–29–1, *et seq.* (1985), and based upon findings of fact, should not be reversed unless clearly wrong." Syllabus Point 1, *Randolph County Board of Education v. Scalia,* 182 W.Va. 289, 387 S.E.2d 524 (1989).

Syl. pt. 1, *Martin v. Randolph County Bd. of Educ.,* 195 W.Va. 297, 465 S.E.2d 399 (1995). Mindful of these applicable standards, we now consider the substantive issues raised herein.

### III.

### DISCUSSION

 On appeal to this Court, the Board assigns error to the circuit court's ruling.[11] Mr. Alderman responds that the circuit court's rulings were correct.[12] While the

---

10. The West Virginia Educational Employees Grievance Board is, for the purposes of this appeal, now the West Virginia Education and State Employees Grievance Board. *See Harrison County Bd. of Educ. v. Carson–Leggett,* 195 W.Va. 596, 598 n. 1, 466 S.E.2d 447, 449 n. 1 (1995) (per curiam). *But cf.* W. Va.Code § 6C–3–1 (2007) (Supp.2008) (explaining that the West Virginia Education and State Employees Grievance Board is terminated, and the West Virginia Public Employees Grievance Board is created, effective July 1, 2007). We will refer to the governing board by the name that was applicable at the time of the underlying controversy, namely the West Virginia Education and State Employees Grievance Board.

11. Specifically, the Board contends that the circuit court erred (1) by failing to give meaningful attention to the ALJ's findings of fact; (2) in finding that the allegations made by Mr. Alderman were matters of public concern; (3) in finding that Mr. Alderman's conduct at the transfer hearing did not interfere with the Board's ability to perform its job; (4) by concluding that the Board did not prove that Mr. Alderman was insubordinate; and (5) by concluding that Mr. Alderman's punishment should have been mitigated. The circuit court made only two basic rulings: (1) Mr. Alderman's speech was constitutionally protected, and (2) even if Mr. Alderman's speech was not free speech, progressive discipline less severe than termination should have been used by the Board. This opinion's discussion of the circuit court's rulings will subsume the majority of the Board's assignments of error. Moreover, assertion number four by the Board is a mischaracterization of the circuit court's find-

ings. The Board asserts that the circuit court erred by concluding that the Board did not prove that Mr. Alderman was insubordinate. A true reading of the circuit court's order shows that, in the discussion regarding progressive discipline, the circuit court states that "[t]he conduct which allegedly amounted to insubordination justifying termination occurred at one hearing where Mr. Alderman was grieving his transfer to a different position." The circuit court order made no finding regarding whether Mr. Alderman was, in fact, insubordinate. Implicit within the circuit court order is the finding that Mr. Alderman was insubordinate. In the event that it was found that Mr. Alderman's speech was not constitutionally protected, the circuit court made an alternative finding that termination was too severe of a punishment. Given the context of the order, this is a recognition of Mr. Alderman's insubordinate conduct. This opinion will only address the issues that are properly before it by virtue of the rulings made by the circuit court. *See also* n. 12, *infra.*

12. While Mr. Alderman's brief is inartfully drafted and does not set forth legal arguments, it seems to assert two issues as cross-petitions for appeal. The first issue is moot as it asks for Justice Maynard's recusal, and Justice Maynard is no longer a sitting member of this Court. The second issue is Mr. Alderman's contention that the Board's attorney, Mr. Bailey, is illegally representing the Board without authorization. Mr. Alderman's brief spends an inordinate amount of time arguing this point and reciting parts of the contract of employment between Mr. Bailey's law firm and the Board. This issue appears to

parties set forth multiple assignments of error,[13] the circuit court made only two basic rulings: (1) Mr. Alderman's speech was protected by the First Amendment, and (2) even if it was not protected speech, progressive discipline to a lesser degree than termination should have been used. This appeal can be resolved by addressing the two issues that the circuit court found dispositive in rendering its ruling. We find that the circuit court's rulings were in error on both issues and, accordingly, reverse the circuit court's decision and reinstate the ALJ's decision. In so doing, this opinion will address each issue decided by the circuit court. We will first address the issue of whether Mr. Alderman's speech was constitutionally protected. Then, we will turn to the issue of the propriety of progressive discipline.

### A. First Amendment Free Speech

The circuit court found that "it is clear that Mr. Alderman's speech is constitutionally protected. Upholding the Board's decision to terminate him based on that speech was an abuse of discretion and the decision of the Administrative Law Judge is reversed." In so ruling, the circuit court reasoned that Mr. Alderman's speech at the hearing and on the internet raised legitimate issues of public concern and, thus, was constitutionally protected speech. We disagree.

The First Amendment of the Constitution of the United States provides as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.[14] When this Court was previously confronted with analyzing a similar issue of free speech under the First Amendment, we relied on a case from the United States Supreme Court in holding:

> Under *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), public employees are entitled to be protected from firings, demotions and other adverse employment consequences resulting from the exercise of their free speech rights, as well as other First Amendment rights. However, *Pickering* recognized that the State, as an employer, also has an interest in the efficient and orderly operation of its affairs that must be balanced with the public employees' right to free speech, which is not absolute.

Syl. pt. 3, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983). The body of the *Orr* opinion goes on to discuss the *Pickering* factors as follows:

> Consequently, some general restrictions on a public employee's right to free speech were recognized in *Pickering*. First, speech, to be protected, must be made with regard to matters of public concern. Second, statements that are made "'with the knowledge [that they] ... were false or with reckless disregard of whether [they were] ... false or not,'" are not protected. 391 U.S. at 569, 88 S.Ct. at 1735, 20 L.Ed.2d at 817. Third, statements made about persons with whom there are close personal contacts which would disrupt "discipline ... or harmony among coworkers" or destroy "personal loyalty and confidence" may not be protected. 391 U.S. at 570, 88 S.Ct. at 1735, 20 L.Ed.2d at 818.

*Id.*, 173 W.Va. at 344, 315 S.E.2d at 601–02 (internal footnote omitted). In further elaboration of the first factor set forth by *Pickering*, it first requires determining whether the

---

be without merit; however, regardless of merit, it is not properly before this Court because no underlying decision has been made on the allegation. *See* Syl. pt. 2, *Duquesne Light Co. v. State Tax Dep't*, 174 W.Va. 506, 327 S.E.2d 683 (1984) ("'This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance.' Syllabus Point 2, *Sands v. Security Trust Co.*, 143 W.Va. 522, 102 S.E.2d 733 (1958).").

**13.** *See* notes 11 and 12, *supra.*

**14.** The right to freedom of speech is similarly recognized in our state constitution. *See* W. Va. Const. art. III, § 7 ("No law abridging the freedom of speech, or of the press, shall be passed; but the legislature may by suitable penalties, restrain the publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation.").

employee spoke as a citizen on a matter of public concern. *See Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 1958, 164 L.Ed.2d 689 (2006). If the employee did not speak as a citizen on a matter of public concern, then the employee has no First Amendment cause of action based on the employer's reaction to the speech. *Id.* If the employee did speak as a citizen on a matter of public concern, the possibility of a First Amendment claim arises. *Id.*

 In light of our prior treatment of this issue, we now specifically hold that there are some general restrictions on a public employee's right to free speech. First, an employee's speech, to be protected, must be spoken as a citizen on a matter of public concern. If the employee did not speak as a citizen on a matter of public concern, then the employee has no First Amendment cause of action based on the employer's reaction to the speech. If the employee did speak as a citizen on a matter of public concern, the possibility of a First Amendment claim arises and a second and a third factor are invoked. The second factor that is invoked considers statements that are made with the knowledge that they were false or with reckless disregard of whether they were false, and such statements are not protected. The third factor that is invoked considers statements made about persons with whom there are close personal contacts that would disrupt discipline or harmony among coworkers or destroy personal loyalty and confidence, and such statements may not be protected.

 The *Orr* opinion, relying on *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), provides further guidance as to the burden imposed when a plaintiff is alleging constitutionally protected conduct:

"[T]he burden [is] properly placed upon [plaintiff] to show that his conduct [was] constitutionally protected, and that this conduct was a 'substantial factor'-or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire

him. [Plaintiff] having carried that burden, however, ... the Board had [to show] by a preponderance of the evidence that it would have reached the same decision as to [plaintiff's] reemployment even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. at 576, 50 L.Ed.2d at 484. (Footnote omitted).

*Orr,* 173 W.Va. at 344, 315 S.E.2d at 602.[15] Thus, as previously discussed in *Orr* in regard to an action under 42 U.S.C. § 1983, we now specifically hold that the burden is properly placed on the public employee to show that conduct is constitutionally protected and, further, that this conduct was a substantial or motivating factor in the employment decision. Once the public employee carries that burden, however, the public employer must show by a preponderance of the evidence that it would have reached the same decision as to the public employee's employment even in the absence of the protected conduct.

In *Orr,* this Court applied only one of the *Pickering* factors, *i.e.,* whether the plaintiff's criticism of remodeling plans for a public facility constituted matters of public concern, to uphold the portion of a jury verdict finding that a college librarian at a public institution made statements protected by the First Amendment. The *Orr* Court relied on the fact that these designs were to be applied to a public facility in determining that the statements were made in regard to a matter of public concern and deserved First Amendment protection.

Applying the *Orr* case and adopting its recitation of the *Pickering* factors to Mr. Alderman's speech at the transfer hearing, it is clear that his speech is not protected speech under the First Amendment. Thus, Mr. Alderman fails to meet his burden of proof that his conduct was constitutionally protected.

 First, to be protected speech, it must be made with regard to matters of public concern. Mr. Alderman's comments

15. *See also* Syl. pt. 4, *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593 (1984) ("In a suit under 42 U.S.C. § 1983, where the plaintiff claims that he was discharged for exercising his First Amendment right of free speech, the burden is initially upon the plaintiff to show: (1) that his conduct was constitutionally protected; and (2) that his conduct was a substantial or motivating factor for his discharge. His employer may defeat the claim by showing that the same decision would have been reached even in the absence of the protected conduct.").

about the Superintendent and Treasurer being cockroaches and thieves, his personal statements against the intelligence of the Superintendent, as well as his accusations of a Board member being an adulterer were not matters of public concern. Admittedly, thievery and misappropriation of money may be a matter of public concern. Moreover, if a Board member is not a proper resident of the district as required, that is also an issue of public concern. However, the issue of thievery and misappropriation arose from an allegation of the use of money for the golf team. The issue had been properly raised at a previous Board meeting and had already been through a full investigation with a finding of no impropriety. Mr. Alderman was fully aware of this final resolution as he was the person who properly raised the issue and followed through the investigation on a statewide level. Further, while Mr. Alderman's allegation that a certain Board member was not a proper resident of the district was a matter of public concern, the purported proof behind the statement was that the Board member was an adulterer and lived with his mistress in another district. No proof was offered to substantiate the allegation, and Mr. Alderman's repeated and constant barrages on the Board member's integrity as a purported adulterer were not matters of public concern.

 Further, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *See Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983) (internal footnote omitted). Significantly, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.*, 461 U.S. at 146, 103 S.Ct. at 1690. Thus, taking the record as a whole, Mr. Alderman's speech was not addressing any matters of public concern. Because the issues were resolved and unsubstantiated, they were no longer being asserted by Mr. Alderman as a matter of public concern. Rather, they were being

asserted to embarrass and interrupt the business of the Board and its members. This intent by Mr. Alderman is further illustrated by his internet posting before the hearing stating his intent to expose the members for the thieves and cockroaches that they are, as well as his website posting following the event, wherein he gloated that he had succeeded in his mission.

Although we have concluded that Mr. Alderman's speech did not meet the test of being made in regard to matters of public concern, this opinion will analyze the other two *Pickering* factors assuming, for the sake of argument, that some of Mr. Alderman's statements regarding a misappropriation of public funds and the legality of a Board member's residency within the proper district were made in regard to matters of public concern. Thus, we now move to the second and third factors enumerated above.

 Second, statements that are made with the knowledge that they were false or with reckless disregard of whether they were false, are not protected. As found by the ALJ, Mr. Alderman's comments were made without consideration of the fact that they may or may not be false. The issue of the golf money had been resolutely decided by an investigation. However, Mr. Alderman continued to shake his finger at the Treasurer and call her a thief and a liar. Such comments were made without consideration of the fact that they may or may not be false. Moreover, his failure to provide any support for his assertion regarding the lack of proper residency by a Board member also shows his disregard for its truthfulness.

Third, statements made about persons with whom there are close personal contacts that would disrupt discipline or harmony among coworkers or destroy personal loyalty and confidence may not be protected. Mr. Alderman disparaged and called into question the credibility of his superiors and/or coworkers on several occasions: on his website prior to the transfer hearing, during the transfer hearing, and on his website after the transfer hearing. Moreover, in a meeting with the Superintendent and several administrators, he referred to the Superintendent as "the dumbest man I have ever seen." It is

clear that these comments were made about persons with whom there are close personal contacts that disrupt discipline among co-workers and destroy feelings of loyalty and confidence.

 *Pickering* recognized that the employer has an interest in the efficient and orderly operation of its affairs that must be balanced with the public employee's right to free speech. We are further guided by the principle that, " 'while the First Amendment invests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance." *Connick*, 461 U.S., at 154, 103 S.Ct. 1684.' " *Garcetti v. Ceballos*, 547 U.S. 410, 420, 126 S.Ct. 1951, 1959, 164 L.Ed.2d 689 (2006). If the speech meets the test to be considered protected speech, then a balancing test is used to determine whether the speech must be tolerated even if it would undermine the Board's authority. Thus, even assuming, *arguendo*, that any of Mr. Alderman's speech met the test to be considered protected free speech, once that protection is balanced with the Board's interest in the efficient and orderly operation of its affairs, it is clear that Mr. Alderman's conduct interfered with the employer's interest.

The Board is responsible for all aspects of the operation of the educational system in its county. The effective fulfillment of this duty requires the trust, confidence, and respect of parents and students. Mr. Alderman's behavior, publicly attacking personal matters of the Board that are not relevant to whether Mr. Alderman should be transferred, specifically undermined the Board's ability to maintain the necessary trust and confidence of the public. The damage done by Mr. Alderman's conduct is supported by the parents who testified at the grievance hearing regarding his appalling behavior and by the public questions that the Treasurer had to endure regarding whether she stole money.

In this case, Mr. Alderman requested a hearing on his proposed transfer. The singular purpose of that hearing was to determine whether the recommendation had a sufficient basis to be approved. Instead, Mr.

Alderman turned it into a malicious bashing session over matters that are unrelated to his transfer. This is a case of planned, insubordinate behavior that undermined the Board's authority to provide effective and efficient services to its students. Mr. Alderman's speech is not entitled to First Amendment protection.

### B. *Progressive Discipline*

The circuit court also found that "[t]he Administrative Law Judge's decision that mediation of the severe penalty of termination was not required is arbitrary. Even if Mr. Alderman's speech had not been protected, the Board violated its policy of progressive discipline in terminating Mr. Alderman." We disagree.

 Because we find that the speech was not protected, we will briefly address the issue of progressive discipline. W. Va.Code § 18A–2–8 (1990) (Repl.Vol.2001)[16] authorizes county boards of education to discipline employees and allows suspension or dismissal for insubordination. The relevant part of that code section provides as follows:

> Notwithstanding any other provisions of law, a board may suspend or dismiss any person in its employment at any time for: Immorality, incompetency, cruelty, insubordination, intemperance, willful neglect of duty, unsatisfactory performance, the conviction of a felony or a guilty plea or a plea of nolo contendere to a felony charge....

We have previously held that " '[t]he authority of a county board of education to dismiss a teacher under *W. Va.Code* 1931, 18A–2–8, as amended, must be based upon the just causes listed therein and must be exercised reasonably, not arbitrarily or capriciously' Syl. Pt. 3, *Beverlin v. Board of Educ.*, 158 W.Va. 1067, 216 S.E.2d 554 (1975)." Syl. pt. 4, *Maxey v. McDowell County Bd. of Educ.*, 212 W.Va. 668, 575 S.E.2d 278 (2002).

We recognize that there are some circumstances that would require an improvement plan or discipline to a lesser degree than termination of employment. As recognized in the *Maxey* case, pursuant to West Virginia

---

**16.** W. Va.Code § 18A–2–8 was amended in 2007; however, the changes do not change the substance of the portions relevant to this decision. We will refer to the statute in effect at the time of the underlying case.

Board of Education Policy § 5300(6)(a), 9 W. Va.C.S.R. § 126–141–2.6 (hereinafter referred to as "Policy 5300"),

> [e]very employee is entitled to know how well he/she is performing his/her job, and should be offered the opportunity of open and honest evaluation of his/her performance on a regular basis. Any decision concerning promotion, demotion, transfer or termination of employment should be based upon such evaluation, and not upon factors extraneous thereto. Every employee is entitled to the opportunity of improving his/her job performance, prior to the terminating or transferring of his/her services, and can only do so with the assistance of regular evaluation.

*See Maxey,* 212 W.Va. at 676, 575 S.E.2d at 286. Explaining the effect of the application of Policy 5300, this Court has previously held that

> [f]ailure by any board of education to follow the evaluation procedure in West Virginia Board of Education Policy No. 5300(6)(a) prohibits such board from discharging, demoting or transferring an employee for reasons having to do with prior misconduct or incompetency that has not been called to the attention of the employee through evaluation, and which is correctable.

Syl. pt. 3, *Trimboli v. Board of Educ.,* 163 W.Va. 1, 254 S.E.2d 561 (1979). Further explanation was provided in *Mason County Board of Education v. State Superintendent of Schools,* 165 W.Va. 732, 274 S.E.2d 435 (1980), when this Court stated that

> a board must follow the § 5300(6)(a) procedures if the circumstances forming the basis for suspension or discharge are "correctable." The factor triggering the application of the evaluation procedure and correction period is "correctable" conduct. What is "correctable" conduct does not lend itself to an exact definition but must . . . be understood to mean an offense or conduct which affects professional competency.

*Id.,* 165 W.Va. at 739, 274 S.E.2d at 439.

Typically, Policy 5300 has been interpreted to apply to issues of job performance. However, there are instances when it has been applied to cases involving purported insubordination. *See Holland v. Board of Educ. of Raleigh County,* 174 W.Va. 393, 327 S.E.2d 155 (1985) (per curiam) (finding that attempt to transfer teachers on the basis of insubordination violated Policy 5300 in light of the fact that disciplinary transfer was retaliatory for teachers' grievance proceedings filed against principal); *see also Maxey,* 212 W.Va. 668, 575 S.E.2d 278 (finding that initial confrontations were primarily performance related and that the insubordination claim was derivative of the original performance issue).

■■■ While the *Holland* case and the *Maxey* case involved purported insubordination and the application of Policy 5300, both cases were decided in the realm of retaliatory discharge and performance issues, not insubordination. Thus, Policy 5300 was found to apply in both of those cases. Importantly, we have recognized

> [i]t is not the label given to conduct which determines whether § 5300(6)(a) procedures must be followed but whether the conduct forming the basis of dismissal involves professional incompetency and whether it directly and substantially affects the system in a permanent, non-correctable manner.

Syl. pt. 4, *Mason County Bd. of Educ.,* 165 W.Va. 732, 274 S.E.2d 435. Thus, no matter what label is used to define the conduct, the determining factor is whether the complained-of conduct is correctable.

■■ Here, Mr. Alderman was acting willfully when he verbally attacked his employers. He made unsubstantiated comments with the sole purpose of demeaning and embarrassing his employer. Moreover, it was planned and premeditated, and then he boasted about his conduct on his website after-the-fact. Significantly, Mr. Alderman was never apologetic for his behavior. In fact, he maintained his right to be disrespectful. During the transfer hearing, Mr. Alderman was constantly directed by Board members to focus on the transfer issue at hand. Despite these repeated attempts, Mr. Alderman failed to contain his argument to any of the issues at hand. While Mr. Alderman's behavior may properly be defined as insubordination, the real issue is the fact that his continued behavior evidences a failure of Mr.

Alderman to correct his behavior. Thus, Policy 5300 is inapplicable and no mitigation of discipline was required. The Board properly dismissed Mr. Alderman under W. Va.Code § 18A–2–8, and the decision was not unreasonable, arbitrary, or capricious.

## IV.

## CONCLUSION

Based on the foregoing, we reverse the Kanawha County Circuit Court's October 2, 2007, order and reinstate the September 22, 2006, decision by the Administrative Law Judge.

Reversed.

Justice ALBRIGHT not participating.

Senior Status Justice McHUGH, sitting by temporary assignment.