# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**Shelli E. Smith,**
**Respondent Below, Petitioner**

**vs)  No. 15-0062** (Kanawha County 14-AA-77)

**The Berkeley County Board of Education,**
**Petitioner Below, Respondent**

**FILED**

November 20, 2015

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Shelli E. Smith, by counsel Andrew J. Katz, appeals the order of the Circuit Court of Kanawha County, entered on December 18, 2014, reversing the decision of the West Virginia Public Employees Grievance Board and reinstating the Berkeley County Board of Education's decision to terminate petitioner's employment. Respondent Berkeley County Board of Education appears by counsel Howard E. Seufer, Jr. and Jessie F. Reckart.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

### *The Incident Preceding the Termination of Petitioner's Employment*

We first related the facts relevant to this case in *Smith v. Board of Education of Berkeley County,* No. 14-0851 (W.Va. Sup. Ct., May 15, 2015)(memorandum decision), which came before this Court on petitioner's appeal from the Circuit Court of Kanawha County, after the circuit court reversed the decision of WorkForce West Virginia Board of Review granting petitioner unemployment benefits. The facts of that case are substantially similar to the facts of this one, inasmuch as the administrative law judges of WorkForce West Virginia and the West Virginia Public Employees Grievance Board each incorporated the record from the Berkeley County Board of Education's hearing into its respective record. However, the Public Employees Grievance Board considered additional evidence not described in our earlier decision, including testimony from student Tyler N., who did not testify before the WorkForce West Virginia Board of Review, as further described below.

Petitioner was an English teacher at Martinsburg High School from 1998 until the termination of her employment in 2013. She shared a classroom and "co-taught" with Kate Springer, also an English teacher. Ms. Springer distributed a syllabus to her class that noted: "I am sensitive and sensitive to all forms of Axe Body Wash, deodorant, sprays and lotions. I am

1

also sensitive and sensitive to all forms of Victoria's Secret lotions and [sprays]. Please avoid wearing these to my class. Thank you!"

In early 2013, while Ms. Springer was in the hallway and petitioner was in the classroom, several students sprayed Axe products, particularly in the area of Ms. Springer's desk. This event became known as "Axe the Teacher Day." Ms. Springer did not report this incident at the time it occurred. However, she testified at a Board of Education hearing conducted in October of 2013 that the incident caused severe breathing problems that led to her seeking treatment from an urgent care facility, and that she missed four and a half days of school because of her condition.

On May 22, 2013, the mother of petitioner's student, Tyler N., contacted the assistant principal of Martinsburg High School, Trey Arvon, and complained that her son had received from petitioner a score of zero on a test because Tyler talked during the test. Assistant Principal Arvon arranged a meeting with the parent and petitioner, and during that meeting the parent brought the product-spraying incident to Mr. Arvon's attention. When the episode was raised at the meeting, petitioner called it a "joke." In fact, Assistant Principal Arvon later testified that petitioner said, "that was a joke, she's not allergic." This was the first instance that Mr. Arvon heard of Axe the Teacher. He placed petitioner on paid leave and initiated an investigation. Mr. Arvon requested statements, written separately but simultaneously, from four students that same day: Tyler, Cain M., Kelsea S., and Josh M. Each student explained that petitioner conceived Axe the Teacher Day. Cain wrote in his statement that petitioner directed a student to cry in order to lure Ms. Springer into the hallway so that the students could spray the products, and that petitioner directed another student to spray Ms. Springer's chair and personal belongings. Josh wrote in his statement, "Miss said she wanted her dead."

By letter dated June 18, 2013, Berkeley County Superintendent of Schools Manny Arvon II informed petitioner that he would recommend that the Board of Education terminate her employment for her part in Axe the Teacher.[1] Subsequently, on July 16, 2013, the superintendent sent petitioner a supplemental letter informing her that a second basis for his recommendation was that she lacked certification to teach special education in the State of West Virginia. Petitioner lacked the requisite certification because the superintendent refused to recommend its continuation.

*The Board of Education Hearing*

The Board of Education considered the superintendent's recommendation at a meeting conducted in October of 2013. Petitioner was represented by counsel at that hearing, and the Board heard a great deal of testimony, including that of several students and Assistant Principal Arvon. The assistant principal eventually (by August of 2013) had collected statements from

---

[1] In that letter, he referred to a prior incident that occurred in 2006, in which petitioner wrote a threatening note to another teacher, subsequent to which he recommended her termination. Superintendent Arvon's letter reflects that petitioner was permitted to retain employment after the 2006 incident if she met certain conditions, including submitting to a psychiatric examination.

every student that had been in the class on Axe the Teacher Day.[2] He testified before the Board of Education that the "gist" of those statements

> was kind of all over the place. I mean we had the four . . . on the 22nd. I had some students say that they had no recollection of the event. A couple students said [petitioner] was in the room and she heard about the plot and did nothing. And some students were stating Ms. Smith was innocent.

Petitioner testified that she saw a female student, whom she could not name, spray something. She further testified:

> The only student that I saw spray anything was [E.T.] . . . and as quick as he could spray it I yelled at him. And he said, Ms. Smith, why are you yelling now? I do this every day. And I said, you spray Axe every day in here? And he said, why I spray it before I come into the classroom because I just come from PE class. And would you rather smell this or would you rather smell—and he just pointed to himself.

> And it happened so quickly I couldn't stop it. I couldn't have grabbed the can. I mean he was across the room from me. And that was the only spraying that I witnessed. And like I said, it was just so fast. He whipped the can out and he sprayed it, and that was—and one of the girls sprayed it behind my back. . . .

> In fact [Topanga S., a female student who had written a letter on petitioner's behalf] told me the next day that she said, you know how I'm always the last one to leave the classroom? And I said yes. You know she walks home. And she said, Ms. Springer told me that it smelled good. And that's—you know that's the only time that—and I said well that's—you know that's wonderful. . . .

Petitioner also testified that she told Assistant Principal Arvon that Axe the Teacher Day was a joke, and that Ms. Springer had no reaction. In addition, Carolyn Munroe, a substitute teacher who had covered Ms. Springer's class immediately before Axe the Teacher Day, testified that when she informed the class that Ms. Springer would be returning, "they started pleading with [her] to stay" and "started talking about this perfume situation" to keep Ms. Springer away. Ms. Munroe testified that she and petitioner instructed the students that they should not conspire against teachers.[3]

---

[2] We hereby expressly reject the Grievance Board's discredit of Assistant Principal Arvon's investigation on the ground that it was "superficial."

[3] Petitioner argues that the testimony of Ms. Munroe (who did not testify at the Level Grievance III Hearing) corroborates petitioner's own testimony, and that the administrative law judge correctly placed substantial reliance on it. We note that Ms. Springer had returned to work before—and, indeed, it was her return that apparently prompted—Axe the Teacher Day, and Ms. Munroe thus had no knowledge of the events crucial to the determination of this appeal.

3

On the day following the Board of Education meeting, October 3, 2013, the superintendent sent petitioner a letter, by certified mail, informing her that the Board had voted to terminate her employment.

*Petitioner's Grievance*

Petitioner filed a grievance, and a Level III grievance hearing was conducted by an administrative law judge ("ALJ") for the West Virginia Public Employees Grievance Board on May 28, 2014. The ALJ accepted the transcript from the Board of Education hearing into the record, as well as the transcript of petitioner's unemployment compensation benefits hearing. Tyler N. testified at the Level III hearing that he did not remember what happened to his zero grade after the meeting with his mother and Assistant Principal Arvon, and he did not remember how the subject of Axe the Teacher came up in the meeting. He testified that he told his mother that petitioner "came up with the idea . . . to spray cologne around the room," but later testified, "[e]ither her or the students. Again, I'm not quite sure." He explained, "I remember one student leading Ms. Springer out, saying some kind of excuse to stall her, and then [petitioner] gave a signal of some kind for the students to go around the room and spray in the teachers['] general area in the classroom."

Tyler was unable to remember the exact hand signal, and was unable to remember exactly where in the classroom petitioner stood in relation to the action. His mother confirmed in her testimony that she specifically explained in the meeting that she had concerns about students spraying cologne after having been told not to do so, and petitioner responded it "was just a joke." Another student, Kelsea S., testified that the "whole classroom" discussed the plan, in the presence of petitioner and Ms. Munroe (Ms. Springer's substitute) to spray products and "put [Ms. Springer] back in the hospital so she didn't show up anymore." Kelsea testified that petitioner said "[j]ust that we should do it."

At the conclusion of the administrative hearing, the administrative law judge found that the evidence presented was "evenly balanced" and respondent therefore failed to meet its burden of supporting, by a preponderance of the evidence, its decision to terminate petitioner's employment. Respondent then filed its appeal with the Circuit Court of Kanawha County. By order entered on December 18, 2014, the circuit court reversed the Grievance Board's decision, specifically rejecting the Grievance Board's determination that petitioner was a credible witness, and rejecting the Grievance Board's determination that Tyler N. was not a credible witness.

Petitioner filed her notice of appeal with this Court. She asserts five assignments of error, which we summarize as follows: that (1) the circuit court erred in making credibility determinations that were contrary to the credibility determinations of the Grievance Board; (2) the circuit court erred in ruling that the Grievance Board was clearly wrong when it found that the evidence was "evenly balanced"; (3) the circuit court erred in finding that respondent had valid reasons under West Virginia Code § 18A-2-8 to terminate petitioner's employment because the court's findings of fact (based on the court's credibility determinations) were not supported by the evidence; (4) the circuit court was clearly wrong in finding that the Grievance Board was clearly wrong when it determined that the Board of Education failed to prove by a preponderance of the evidence that petitioner encouraged Axe the Teacher, or that petitioner was insubordinate

and willfully neglectful of her duties; and (5) the circuit court's decision "is wrong and should be reversed."

### *The Standard of Review*

This appeal comes before us from the Circuit Court of Kanawha County, which reversed the decision made by the West Virginia Education and State Employees Grievance Board. We extensively explained our standard of review for such cases in *Alderman v. Pocahontas Cnty. Bd. of Educ.*, 223 W. Va. 431, 438-39, 675 S.E.2d 907, 914-15 (2009):

> The appeal provisions of W.Va. Code § 18-29-7 . . . provide, in relevant part, that an appeal may be taken to a circuit court where the final grievance decision:
>
> > (1) was contrary to law or lawfully adopted rule, regulation or written policy of the chief administrator or governing board,
> >
> > (2) exceeded the hearing examiner's statutory authority,
> >
> > (3) was the result of fraud or deceit,
> >
> > (4) was clearly wrong in view of the reliable, probative and substantial evidence on the whole record, or
> >
> > (5) was arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
>
> More particularly,
>
> [g]rievance rulings involve a combination of both deferential and plenary review. Since a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge, a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Credibility determinations made by an administrative law judge are similarly entitled to deference. Plenary review is conducted as to the conclusions of law and application of law to the facts, which are reviewed de novo.
>
> Syl. Pt. 1, *Cahill v. Mercer County Bd. of Educ.*, 208 W.Va. 177, 539 S.E.2d 437 (2000).
>
> We also are guided by the principle that "[t]his Court reviews decisions of the circuit [court] under the same standard as that by which the circuit [court] reviews the decision of the ALJ." *Martin v. Randolph County Bd. of Educ.*, 195

W.Va. 297, 304, 465 S.E.2d 399, 406 (1995). Specifically, "[a]lthough we accord great deference to the findings of fact of the West Virginia Educational Employees Grievance Board, we review, *de novo*, questions of law." Syl. Pt. 2, *Maikotter v. University of W.Va. Bd. of Trs.*, 206 W.Va. 691, 527 S.E.2d 802 (1999)(footnote added). Thus,

> "[a] final order of the hearing examiner for the West Virginia Educational Employees Grievance Board, made pursuant to W.Va. Code, 18–29–1, et seq. (1985), and based upon findings of fact, should not be reversed unless clearly wrong." Syllabus Point 1, *Randolph County Board of Education v. Scalia*, 182 W.Va. 289, 387 S.E.2d 524 (1989). Syl. pt. 1, *Martin v. Randolph County Bd. of Educ.*, 195 W.Va. 297, 465 S.E.2d 399 (1995). . . .

Guided by the standards set forth above, we proceed to consider petitioner's assignments of error.

*Discussion*

At the outset, we note that the questions presented by petitioner are substantially intertwined (and, in some cases, repetitive), and we therefore consolidate petitioner's five assignments of error for consideration. The resulting inquiry before us, then, is whether the circuit court's findings of fact, made subsequent to the credibility determinations herein challenged by petitioner, support the termination of petitioner's employment in accordance with West Virginia Code § 18A-2-8(a), which provides that,

> [n]otwithstanding any other provisions of law, a board may suspend or dismiss any person in its employment at any time for: Immorality, incompetency, cruelty, insubordination, intemperance, willful neglect of duty, unsatisfactory performance, the conviction of a felony or a guilty plea or a plea of nolo contendere to a felony charge.

While we acknowledge the circuit court's obligation of deference (*see* Syl. pt. 1, *Cahill*, at 177, 539 S.E.2d at 437), we believe that this case, like petitioner's appeal of the circuit court's decision regarding her unemployment compensation benefits, "presents the rare circumstance wherein application of the requisite deference is not supported by common sense." *Smith*, No. 14-0851 at 5. Though petitioner, Tyler N., and a few other witnesses testified at the Level III grievance hearing, that testimony was minimal compared to the evidence adduced at the Board of Education's termination hearing. Our analysis of the circuit court's consideration of the unemployment compensation hearing applies here with equal force:

> [T]he circuit court more capably assessed the documentary evidence before it than did the Board . . . , and we thus further find that the circuit court corrected clear error in the Board['s] . . . analysis. Our determination on this issue begins with the recognition that the first witnesses consulted by Assistant Principal Arvon provided consistent statements concerning petitioner's involvement in Axe the Teacher Day on the very day that the assistant principal

6

initiated his inquiry, and the witnesses at that time had little or no opportunity to coordinate their accounts. We then recognize that the "even balance" of the students' statements, a factor on which the Board . . . heavily relied, was created in part by some students stating that they had no knowledge of the Axe the Teacher Day events, and others generally proclaiming petitioner's innocence. We find these statements unreliable, inasmuch as petitioner acknowledged at the Board of Education hearing that Axe the Teacher Day did, in fact, occur. By petitioner's own admission, when initially confronted by the mother of Tyler N., she "just to be able to leave ... did say it was a joke. And . . . did say, to reassure her, that Ms. Springer did not have any reaction to it." She further testified that while she was in the classroom on Axe the Teacher Day, one of the female students sprayed a substance that caused her to cough, and then she witnessed a specific male student spray a substance, after which another female student sprayed a substance behind her back. *Based on this testimony, any statement denying the occurrence of Axe the Teacher Day is inherently incredible. . . .* [W]e find the consistent accounts of the four students first consulted by Assistant Principal Arvon extremely compelling, and find no error in the circuit court's credit of the same.

*Smith*, No. 14-0851 at 6-7 (emphasis supplied).

In the case before us, petitioner also testified before the Grievance Board. Having thoroughly reviewed that testimony, we find no reason to set aside the reasoning explained above. We are satisfied by petitioner's testimony before both the Board of Education and the Grievance Board, wherein petitioner herself testified that she informed Tyler N.'s mother that Axe the Teacher was a "joke" and that "Ms. Springer did not have a reaction,"[4] and that petitioner was aware of Axe the Teacher at the time it occurred. As we explained in our earlier decision, "despite [petitioner's] assertion that she had counseled the students not to engage in [Axe the Teacher], she neither cautioned her co-worker not to enter the classroom, nor disciplined the students or otherwise reported the incident." *Smith*, No. 14-0851 at 5.

Furthermore, we agree with the circuit court's finding that the student statements given to Assistant Principal Arvon in support of petitioner were inconsistent, in that some stated petitioner was unaware of Axe the Teacher and some stated that she discouraged the event. However, even some of those statements supporting petitioner suggest that the students' actions were open and notorious. One student wrote that "everyone brought it in and sprayed each other" while petitioner looked on. Other students told Assistant Principal Arvon that they knew nothing about Axe the Teacher, and later provided statements in favor of petitioner. Consequently, the evidence was not "evenly balanced" and the circuit court did not err in setting aside the Grievance Board's finding in this regard.

---

[4] In consideration of this testimony, we find wholly incredible petitioner's suggestion that her reference to "joke" indicated wordplay on the phrase "ask the teacher." Whether such wordplay was employed by petitioner and her students prior to the incident is irrelevant; the context here is apparent.

We turn, then, to the Grievance Board testimony of Tyler N., which the administrative law judge opined was based on Tyler's "ulterior motives" of obtaining revenge for the zero grade given to him by petitioner. The administrative law judge further found that Tyler N. "recanted his initial statement, or at a minimum indicated he could not remember [petitioner's] actions, concerning [petitioner's] alleged involvement. . . ." We agree with the circuit court's analysis of the Grievance Board's treatment of Tyler's testimony:

> [A] review of the Level III Hearing transcript reveals that the zero grade was resolved *before* Mr. Arvon took statements from [Tyler] and his mother . . . regarding "Axe the Teacher." Mr. Arvon testified that [petitioner] agreed to give [Tyler] credit for the test before Mr. Arvon began investigating "Axe the Teacher." Thus, the "ulterior motive" was defused before [Tyler and his mother] gave Mr. Arvon their statements regarding "Axe the Teacher." Accordingly, the [c]ourt finds that the [Grievance] Board was clearly wrong in finding [Tyler's and his mother's] testimony not credible.

> . . . The [Grievance] Board also found that "one of the main accusers" recanted "his initial statement" at the Level III Hearing regarding [petitioner's] involvement in "Axe the Teacher." The only male main accuser that testified at Level III is [Tyler], but [Tyler] did not recant his initial statement. Rather, his testimony at the [Board of Education] and before the [Grievance] Board is consistent with regard to [petitioner's] involvement in "Axe the Teacher." At the [Board of Education] hearing and the Level III hearing, [Tyler] testified that [petitioner] signaled the students to spray cologne once another student distracted Ms. Springer. Further, [Kelsea S.], another "main accuser" who testified at the Level III hearing, did not recant her statement, either. Likewise, the [c]ourt finds that the [Grievance] Board was clearly wrong in finding that [Tyler] recanted his statement.

As described in the Court's recitation above, Tyler N. was forthcoming in testifying that he did not remember whether the students or petitioner first suggested Axe the Teacher. His testimony regarding the execution of the event was clear, however: "I remember one student leading Ms. Springer out, saying some kind of excuse to stall her, and then [petitioner] gave a signal of some kind for the students to go around the room and spray in the teachers['] general area in the classroom." This testimony leaves no room for doubt that petitioner was aware of Axe the Teacher before it occurred and that she was, at a minimum, complicit. Thus, the circuit court did not err in setting aside the Grievance Board's finding in this regard.

Inasmuch as we find no fault with the credibility determinations made by the circuit court, we find no error in the circuit court's findings of fact, and we conclude that petitioner's five assignments of error are without merit. Petitioner's actions, as set forth in the circuit court's findings of fact in its order entered on December 18, 2014, adequately support the termination of petitioner's employment in accordance with one or more of the bases set forth in West Virginia Code § 18A-2-8(a).

For the foregoing reasons, we affirm.

8

Affirmed.

**ISSUED:**  November 20, 2015

**CONCURRED IN BY:**

Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Menis E. Ketchum
Justice Allen H. Loughry II

**DISQUALIFIED:**

Chief Justice Margaret L. Workman

9